157 P.3d 388 (2007)
David J. JENKINS, Respondent,
v.
WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Appellant.
Venetta Gasper, and Tommye Myers, Respondents,
v.
Washington State Department of Social and Health Services, Petitioner.
Nos. 78652-6, 78931-2.
Supreme Court of Washington, En Banc.
Argued November 9, 2006.
Decided May 3, 2007.
William Lee Williams, Michael Mackaman Young, Attorney General's Office, Olympia, for Appellant.
Meagan J. MacKenzie, Amy Louise Crewsdon, Northwest Justice Project, Olympia, Gregory A. McBroom, Livengood Fitzgerald & Aslkog, Kirkland, Rajiv Nagaich, Law Offices of Johnson & Nagaich, Federal Way, for Respondent.
Dmitri L. Iglitzin, Schwerin Campbell Barnard & Iglitzin LLP, Seattle, for Amicus *389 Curiae (Service Employees International Union, Local 775).
C. JOHNSON, J.
¶ 1 This case involves a challenge to a Washington State Department of Social and Health Services (DSHS) regulation that reduces disabled recipients' benefits because they live with their paid caregivers. Under the regulation, amended and codified as WAC XXX-XXX-XXXX(3)(b), formerly WAC 388-72A-0095 (2005), and referred to as the "shared living rule," DSHS reduces recipients' benefits by 15 percent if they live with their caregiver.
¶ 2 The three disabled recipients, David Jenkins, Vennetta Gasper, and Tommye Myers, challenge the shared living rule on several grounds, including challenges based on (1) the federal Medicaid comparability requirements under 42 U.S.C. § 1396; (2) the federal Medicaid free choice provider guaranty under 42 U.S.C. § 1396; (3) Title II of the Americans with Disabilities Act of 1990 under 42 U.S.C. § 12132; (4) the privileges and immunities clause under article I, section 12 of the Washington Constitution; (5) the equal protection clause under the fourteenth amendment to the United States Constitution; and (6) the due process clause under the fourteenth amendment to the United States Constitution.
¶ 3 In two cases consolidated in this appeal, the regulation was invalidated by the trial courts. In one case, the Court of Appeals affirmed and we granted direct review of the other case and consolidated the cases. We hold that DSHS's program, codified as WAC XXX-XXX-XXXX(3)(b), to reduce benefits to eligible disabled recipients, violates federal comparability requirements under 42 U.S.C. § 1396. Because we find WAC XXX-XXX-XXXX(3)(b) is invalid based on the federal comparability requirements, we find it unnecessary to reach or decide any other issues. The decisions of the courts below are affirmed in part and reversed in part.[1]

FACTUAL AND PROCEDURAL HISTORY
¶ 4 All three recipients in this case are functionally disabled individuals who receive paid in-home personal care services to help them with basic activities of daily living such as bathing, dressing, shopping, housekeeping, and meal preparation. The three recipients challenge the shared living rule, which is one component of an assessment tool used by DSHS. This assessment tool, entitled "Comprehensive Assessment Reporting Evaluation" or CARE, is used to determine an individual's eligibility for in-home care under one of four programs.[2]See WAC XXX-XXX-XXXX through -0140.
¶ 5 In a CARE evaluation, the individual is scored on factors such as an individual's ability to perform daily activities and an individual's mental status. The resulting numerical scores are put into a formula that calculates the individual's base assistance level in hours of care, and places the individual into one of 14 residential classification groups. CARE classification groups range from "Group A Low" (level 1, requiring the least amount of assistance) to "Group E High" (level 14, requiring the most assistance). WAC XXX-XXX-XXXX.
¶ 6 Once the individual qualifies as a recipient, the department determines whether informal supports, like friends or family members, are helping the recipient meet certain needs. If the recipient lives with a caregiver, a second formula is applied to reduce the number of care hours for which the recipient qualifies. This second formula, or shared living rule, was implemented on the theory that if caregivers must clean their own houses, go shopping, and cook meals for their own *390 benefit, certain duplication of efforts are presumed, and, the theory goes, a state should not pay for those tasks that benefit the entire household despite the absence of any specific determination that these tasks are shared.
¶ 7 This second formula was largely derived from the development of the CARE assessment tool which included a "time study report" of caregivers in different settings. DSHS confirmed that it relied on the study to conclude that the percentage of time devoted by live-in caregivers to household tasks ranged from 33 percent to 42 percent. Based on this study, DSHS decided to reduce any recipient's qualified level of care hours by 15 percent if a caregiver resides with a recipient.
¶ 8 The 15 percent reduction is applied without any individual determination of a recipient's needs and is applied as an irrebuttable presumption. DSHS determined 15 percent was appropriate based on the study's conclusion that the percentage of time devoted by live-in caregivers to household tasks ranged from 33 percent to 42 percent but, DSHS does not explain in the study or elsewhere how it arrived at the 15 percent figure. In separate administrative hearings, the 15 percent reduction in care hours, or shared living rule, was challenged by Jenkins, Gasper, and Myers, who are disabled Medicaid recipients living with their paid caregivers.
¶ 9 Jenkins suffers from human immunodeficiency virus/acquired immune deficiency syndrome (HIV/AIDS), hepatitis, and liver failure. He has been evaluated by DSHS as "totally dependent" for meal preparation and housework; hence, Jenkins' condition requires that he have a caregiver. His partner, Paul Racchetta, has been Jenkins' caregiver for nine years. According to a CARE assessment, Jenkins requires 185 hours of care per month. Before the shared living rule was implemented, Jenkins received 185 hours of paid care per month. After DSHS applied the shared living rule (because Jenkins lives with his caregiver) Jenkins' 184 hours were cut to 153 hours of paid care per month. Jenkins Decl. (Sept. 15, 2004) at 1-2.
¶ 10 Like Jenkins, Gasper's condition requires that she have a caregiver. Gasper is a 66-year-old severely developmentally disabled woman who has been evaluated by DSHS as "totally dependent" for meal preparation and housework. According to the assessment, Gasper requires 184 hours of care per month. After the shared living rule was applied, her hours were reduced initially to 116 and later changed to 152 hours per month.[3] Gasper lives with Linda Green, an unrelated paid caregiver. Green estimates she spends more than 184 hours per month caring for Gasper, and after the reduction to 152 hours, Green said she is unwilling to provide additional unpaid care. In her declaration, Green stated that she must supervise Gasper constantly because of her developmental delays; Gasper is unable to perform basic tasks without assistance, such as eating and toileting. Green Decl. (May 13, 2004) at 1-5.
¶ 11 Like Jenkins and Gasper, Myers has been evaluated by DSHS as "totally dependent" for meal preparation and housework. Myers is an elderly woman with kidney disease; she is on dialysis three times per week. Additionally, Myers is an insulin dependent diabetic. She lives with her disabled son Ricky, her son John, and John's wife. John is Myers' caregiver. Before the shared living rule was implemented, Myers was entitled to receive 184 hours of paid care per month. The CARE assessment set Myers base hours at 190, but after applying the shared living rule, DSHS reduced her hours initially to 116 and then to 153 hours.[4] Myers' caregiver, John, estimates that he spends more than 184 hours per month on his mother's care. In addition to the chores he performs for his family, he spends an extra eight hours per month shopping for his mother's special diet, 100 hours per month extra on housekeeping, and 45 hours per *391 month extra on meal preparation. Myers Decl. (May 27, 2004) at 1-5.
¶ 12 All three Medicaid recipients challenge the shared living rule, asserting that it does not recognize the additional hours their caregivers provide that do not benefit the caregivers or the household in general. None of the recipients here asked for additional reimbursement in excess of what their classifications allowed, only that their benefits not be reduced. In Jenkins' case, based on the classifications, he was "assessed" to receive 185 hours and in Gasper's and Myer's cases, based on the classifications, they were "assessed" to receive 184 hours. After unsuccessful administrative hearings, the three recipients appealed. The trial court in each case invalidated the shared living rule, WAC XXX-XXX-XXXX(3)(b),[5] finding it violated federal comparability requirements.
¶ 13 In Jenkins' case, DSHS appealed the King County Superior Court decision to Division One of the Court of Appeals. In May 2006, the Jenkins case was certified to this court for direct review.
¶ 14 The appeals of Gasper and Myers were consolidated by Thurston County Superior Court. Division Two of the Court of Appeals affirmed the superior court decision that the shared living rule violates federal Medicaid comparability requirements. Gasper v. Dep't of Soc. & Health Servs., 132 Wash.App. 42, 129 P.3d 849 (2006). We granted review (157 Wash.2d 1017, 143 P.3d 598 (2006)), and consolidated the cases.

ISSUE
¶ 15 Whether the shared living rule, WAC XXX-XXX-XXXX(3)(b), violates the federal Medicaid comparability requirement.

ANALYSIS

Standard of Review
¶ 16 The Administrative Procedure Act, chapter 34.05 RCW, sets out the standard of review for decisions involving administrative rules. The relevant portion of the statute provides:
In a proceeding involving review of a rule, the court shall declare the rule invalid only if it finds that: The rule violates constitutional provisions; the rule exceeds the statutory authority of the agency; the rule was adopted without compliance with statutory rule-making procedures; or the rule is arbitrary and capricious.
RCW 34.05.570(2)(c).
¶ 17 Here, the question is whether DSHS exceeded its statutory authority by promulgating a rule that conflicts with federal law, namely 42 U.S.C. § 1396a(a)(10)(B). The DSHS shared living rule, codified as WAC XXX-XXX-XXXX(3)(b), establishes an irrebuttable presumption that the recipient's need for assistance is met for instrumental activities of daily living (IADL) of meal preparation, housekeeping, shopping, and wood supply. If a need is met under the DSHS assessment, it receives a score that is put into a mathematical formula that translates the sum of scores into a cumulative percentage by which the recipient's base hours are adjusted. Here, after making an initial assessment of each recipient's hours of need, DSHS reduced each recipient's hours of care by 15 percent after applying this mathematical formula.
¶ 18 No one disputes that the exact mathematical formula used by DSHS results in an across-the-board 15 percent reduction where a recipient lives with a caregiver, despite the fact that WAC XXX-XXX-XXXX does not have, verbatim, the 15 percent amount; rather, the 15 percent reduction can be demonstrated by manually performing the complex calculations described under WAC XXX-XXX-XXXX. The relevant portion of the DSHS rule, or WAC, provides:
(a) The CARE tool determines the adjustment for informal supports by determining the amount of assistance available to meet your needs, assigns it a numeric percentage, and reduces the base hours assigned to the classification group by the numeric percentage. . . .

*392 . . . .
(b) If you and your paid provider live in the same household, the status under subsection (2)(a) of this section must be met for the following IADLs:
(i) Meal preparation,
(ii) Housekeeping,
(iii) Shopping, and
(iv) Wood supply.
WAC XXX-XXX-XXXX(2)(a), (3)(b).
¶ 19 We review an agency's interpretation of federal law de novo under an "`error of law'" standard. Skamania County v. Columbia River Gorge Comm'n, 144 Wash.2d 30, 42, 26 P.3d 241 (2001) (citing Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wash.2d 169, 175-76, 4 P.3d 123 (2000)).

Comparability Requirement
¶ 20 The federal Medicaid comparability requirement mandates that the medical assistance a state provides for any categorically needy individual "shall not be less in amount, duration, or scope" than the assistance provided to any other categorically needy individual. The relevant portion of the federal Medicaid comparability statute provides:
(B) that the medical assistance made available to any individual described in subparagraph (A)
(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual and
(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A);
42 U.S.C. § 1396a(a)(10).
¶ 21 The agency rule that interprets the federal Medicaid comparability statute provides:
(b) The plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all recipients within the group:
(1) The categorically needy
(2) A covered medically needy group
42 C.F.R. § 440.240.
¶ 22 Courts have consistently recognized this requirement and found that states violated the comparability requirement when some recipients are treated differently from other recipients where each has the same level of need. Schott v. Olszewski, 401 F.3d 682, 688-89 (6th Cir.2005) (finding treatment was not comparable when Medicaid did not reimburse recipient for medical expenses she paid out of pocket after she was wrongfully denied coverage); White v. Beal, 555 F.2d 1146, 1151-52 (3d Cir.1977) (finding statute was illegal when it covered eyeglasses for those suffering from eye diseases but did not cover glasses for patients when refractive error caused poor eyesight).
¶ 23 Here, DSHS asks that we defer to its interpretation of the Medicaid statute's comparability provision because of its expertise in administering that law. We reject this argument because the Medicaid comparability provision is specific in demonstrating Congress' intent to provide comparable services to similarly situated recipients. 42 U.S.C. § 1396a(a)(10)(B); Martin v. Taft, 222 F.Supp.2d 940, 977 (S.D.Ohio 2002) (finding concepts of comparability and equality are neither vague nor ambiguous). Medicaid's manifest purpose is to provide for an individual recipient's needs; thus, the comparability provision requires comparable services when individuals have comparable needs. The question here is whether the three respondents were offered the same amount of medical assistance available to "any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i).
¶ 24 The respondents argue that the comparability provision focuses on parity between individuals. We agree. The requirement of comparability is not merely for parity between groups as argued by DSHS. On the contrary, the plain language of the comparability statute provides that "assistance made available to any other such individual . . . shall not be less [than that] made available to individuals. 42 U.S.C. § 1396a(a)(10)(B)(i), (ii).
¶ 25 Also, respondents argue that DSHS violates comparability when it allocates paid *393 services using the presumption of the shared living rule, rather than an individualized determination of each recipient's need for paid services. In fact, DSHS has promulgated a rule where recipients like Jenkins, Gasper, and Myers will have certain needs unmet while others with comparable disabilities will receive adequate services. This is so because DSHS neither addresses nor evaluates the variation of individual situations where caregivers perform household tasks that may benefit both the recipient and the household generally. Without such an evaluation, DSHS cannot automatically reduce, in shared living situations, a recipient's need for assistance with housekeeping, shopping, meal preparation, and wood supply; rather, DSHS must assess those needs in the same way and to the same extent that services are provided to the meet the needs of other recipients who do not live in a shared living situation. Individual households may differ in both the total number of hours spent on chores and in each household member's ability to do the work, but this does not change an individual's overall need for assistance.
¶ 26 DSHS argues there is no provision of Medicaid law requiring an individualized determination of public assistance benefits and cites to Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) to support its contention. In Weinberger, the central issue concerned a law designed to bar social security payments to surviving spouses when the only purpose of the marriage was to obtain those benefits. The court stated that administrative difficulties of individual eligibility determinations are matters which policy makers may consider when determining whether to rely on rules which sweep broadly. Weinberger, 422 U.S. at 784-85, 95 S.Ct. 2457.
¶ 27 Weinberger is distinguishable because the present case does not deal with individuals who are attempting to qualify for federal benefits; rather, the individuals here are already eligible recipients of Medicaid. Moreover, DSHS decided on individualized determinations of public assistance benefits for this categorically needy group of Medicaid recipients; yet, DSHS's refusal to consider the individual needs of Jenkins, Gasper, and Myers for assistance with housekeeping, shopping, and meal preparation violates their right to be treated in the same manner as all other categorically needy Medicaid recipients who are individually assessed for the same needs.
¶ 28 Also, DSHS argues that the shared living rule is a valid part of their CARE assessment in determining the level of need for public assistance. We agree that DSHS may use the CARE assessment program to initially classify, rate, and determine a recipient's level of need because this process is consistent with the Medicaid program's purpose. DSHS violates the comparability requirement when it reduces a recipient's benefits based on a consideration other than the recipient's actual need. A 15 percent reduction across the board for all recipients who live with their caregivers does not address, and in fact ignores, the realities of the recipients' individual situations.
¶ 29 Neither DSHS nor the study provides any explanation of how the 15 percent amount is derived from the study's data. Furthermore, the study does not provide data to distinguish clients who are clinically complex from clients who are not. In each case before us, the evidence established that before any reduction, the hours required to provide for the needs of the individual plaintiffs greatly exceeded the hours actually reimbursed.
¶ 30 Once a person is assessed to require and receive a certain number of care hours, the assessment cannot be reduced absent a specific showing that fewer hours are required. To "presume" some recipients need fewer hours of care without individualized determination violates the comparability requirement. A recipient who does not live with a caregiver is assessed an amount needed for meal preparation, housekeeping, and shopping under WAC XXX-XXX-XXXX. Likewise, a recipient who does live with a caregiver should also be assessed with the same criteria for those same needs on an individualized basis. The needs of a recipient are not presumed met without an individual assessment.
¶ 31 We conclude that no reduction is justified unless an individual determination is *394 made supporting that reclassification. Accordingly, we invalidate WAC XXX-XXX-XXXX(3)(b) to the extent that it presumes certain needs of the recipient are met without an individualized determination, and, the presumption results in an automatic 15 percent reduction in the recipient's assessed number of allotted care hours based only on the fact that the recipient lives with a caregiver.

No Exemptions from Comparability Requirement
¶ 32 DSHS argues that the Court of Appeals erred in holding the comparability requirement applies to Washington's two Medicaid waiver programs, community options program entry system (COPES) and medically needy in-home waiver (MNIW). The COPES program, through which Myers and Jenkins receive services and the MNIW program are authorized by the legislature.[6] As waiver programs, both COPES and MNIW operate under a waiver granted by authority of the Social Security Act. 42 U.S.C. § 1396n(c)(1). As part of the framework for home and community-based services (HCBS) waivers, Medicaid law provides that a waiver granted pursuant to its authority "may include a waiver of the requirements of [42 U.S.C. § 1396a(a)(10)(B)] (relating to comparability)." 42 U.S.C. § 1396n(c)(3). Here, DSHS did not provide any information regarding the CARE assessment tool or the shared living rule in its COPES waiver application. In fact, the application language requested a waiver of requirements "in order that services not otherwise available under the approved Medicaid State plan may be provided to individuals served on the waiver." Jenkins Br. of Resp't App.1 at 4. Therefore, we hold the COPES waiver program is not exempt from the federal comparability requirement.

Attorney Fees
¶ 33 Respondents request attorney fees on appeal under RCW 74.08.080(3).[7] Because they prevail, we grant their request pursuant to RAP 18.1 and remand for determination of reasonable fees.[8] Additionally, DSHS disputes the $1,552 in costs awarded to Jenkins by the trial court that included, "photocopying, postage, telecommunication, and `other'." Jenkins Br. of Appellant at 70. DSHS argues that Washington courts have consistently limited cost awards under RCW 4.84.010 to those items specifically recoverable under the statute.
¶ 34 RCW 4.84.010 lists particular types of expenses and defines "costs" as the "prevailing party's expenses in the action . . . including, in addition to costs otherwise authorized by law." The superior court's order stated that the cost awards made under RCW 74.08.080(3) are not limited to statutory costs. We agree. RCW 74.08.080(3) provides that the appellant who prevails "shall be entitled to reasonable attorneys' fees and costs." Because RCW 4.84.010 includes costs "otherwise authorized by law" and RCW 74.08.080(3) awards the prevailing party reasonable costs, we affirm the superior court's order awarding reasonable costs to Jenkins.

Interest on Award
¶ 35 DSHS argues that the superior court's award of interest on Jenkins' award of back benefits was improper. RCW 4.56.110 provides that judgments shall bear interest from the date of entry. We have held this statute does not apply to public agencies absent a clear waiver of sovereign immunity. Specifically, the general rule is that the State cannot be held to interest on its debts without its consent, despite the fact that RCW 4.56.110 does not expressly exempt *395 the state from its operation. Our Lady of Lourdes Hosp. v. Franklin County, 120 Wash.2d 439, 455-56, 842 P.2d 956 (1993). While this general rule is different in the context of contracts between a state agency and a private entity, here the parties, or Medicaid recipients, did not contract with the State. The recipients argue that their caregivers contracted with the State to provide the care hours awarded; however, the caregivers are not parties in this action. Therefore, we find no basis to support an award of interest.

CONCLUSION
¶ 36 We affirm in part and reverse in part. We affirm both the Court of Appeals decision and the trial court decision that WAC XXX-XXX-XXXX(3)(b) violates the federal comparability requirement. We remand for determination, consistent with this opinion, of the amount of personal care hours DSHS wrongfully withheld from the respondents for their unmet need for assistance with housekeeping, shopping, meal preparation services, and wood supply, retroactive to the date the shared living rule was applied to their cases. We affirm the trial court's award of costs but reverse the trial court's award of interest to Jenkins and remand for re-computation. We grant respondents' reasonable attorney fees and costs on appeal.
WE CONCUR: Chief Justice GERRY L. ALEXANDER, Justice TOM CHAMBERS, Justice SUSAN OWENS, and Justice RICHARD B. SANDERS.
FAIRHURST, J. (dissenting).
¶ 37 Pursuant to legislative mandate, the Department of Social and Health Services (DSHS) developed the comprehensive assessment reporting evaluation (CARE) tool. The CARE tool provides a mechanism for uniformly assessing functional disability and allocating state-paid personal care services to individuals seeking such services. One component of the CARE tool, the shared living rule,[1] adjusts the allocation of services when an individual lives with his or her paid caregiver. The majority concludes that the shared living rule violates the federal Medicaid comparability provision, which requires a state to make available to an individual the same "amount, duration, [and] scope [of] medical assistance" as it makes available "to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i). I disagree.
¶ 38 First, I disagree with the majority's position that DSHS should be accorded no administrative deference in our review of the shared living rule. Unlike the majority, I do not believe that the comparability provision clearly indicates Congress's intent with respect to the specific question before us. Properly framed, that question iswhat factors may be considered when assessing the relative needs of individuals seeking Medicaid assistance? On this question the comparability provision is silent. Given that silence, I would accord DSHS some measure of deference based on its expertise in administering the State's Medicaid program.
¶ 39 Second, I disagree with the majority's claim that the shared living rule is invalid because "`presum[ing]' some recipients need fewer hours of care without individualized determination violates the comparability requirement." Majority at 393. While I agree that the shared living rule operates as a presumption, it is just one of the many presumptions in the CARE tool. Furthermore, properly understood, the CARE tool does not produce any individualized determinations of the need for services.
¶ 40 Accepting the majority's premise that the shared living rule violates the comparability provision because it reduces services without an individualized determination establishes a sweeping precedent that could affect not only the CARE tool but the way all public assistance benefits are allocated. The majority's reasoning does not distinguish a principled basis upon which this court should substitute our judgment for that of DSHS in this instance with respect to the shared living rule, but refrain from doing so with respect to other similar presumptions in the CARE *396 tool. As a properly promulgated administrative rule, the shared living rule is presumptively valid and should be upheld if it is reasonably consistent with the comparability provision. In my opinion, because the majority has not demonstrated a principled basis for distinguishing between the shared living rule and other CARE tool rules, the majority has not overcome that presumption of validity. This conclusion is strengthened by granting even the most minimal deference to DSHS's expertise. I would hold that the shared living rule does not violate the comparability provision. Accordingly, I respectfully dissent.

ANALYSIS
A. Administrative Deference
¶ 41 The majority concludes, almost without discussion, that DSHS should be accorded no deference to its interpretation of the comparability provision. Majority at 392. I disagree. Whether DSHS should be accorded any deference requires a more robust analysis of the comparability provision than the majority puts forth. While I agree that "the comparability provision requires comparable services where individuals have comparable needs," majority at 392, the needs of individuals can be compared only after they have been assessed and quantified. Because the comparability provision is silent on that specific question, Chevron deference[2] is warranted to the reasonable interpretation of the provision by the federal agency charged with administering it. That agency has determined that states may consider shared living circumstances in assessing needs and allocating services. Pursuant to state legislative mandate to ensure a uniform system for assessing needs and allocating services, DSHS developed the CARE tool and included a component that considers an individual's shared living circumstances. While not required to consider such circumstances, DSHS in its expertise determined that doing so was appropriate. That determination is entitled to some measure of administrative deference from this court.
¶ 42 The majority suggests that no deference is warranted to DSHS "because the Medicaid comparability provision is specific in demonstrating Congress' intent to provide comparable services to similarly situated recipients." Majority at 392 (emphasis added). The comparability provision mandates simply that the medical assistance that a state makes available to an individual under its Medicaid plan shall not be less "in amount, duration, or scope" than that made available to others who qualify for medical assistance under that plan.[3] 42 U.S.C. § 1396a(a)(10)(B)(i). The comparability provision does not mandate that a state provide all qualifying individuals with identical quantities of services, regardless of their needs for services. Such a requirement would defy logic. Rather, as the majority agrees, "the comparability provision requires comparable services [only where] individuals have comparable needs." Majority at 392. However, what the majority fails to note is that the comparability provision is silent as to how states should quantify the relative needs of those to whom it must provide comparable services.
¶ 43 The Centers for Medicare & Medicaid Services (CMS), the federal agency charged with administering the Medicaid program,[4] has promulgated regulations interpreting the comparability provision. *397 When a court reviews a federal statute, "if the statute is silent or ambiguous with respect to the specific issue," and the federal agency administering the statute has promulgated a regulation construing it, the "court may not substitute its own construction . . . for a reasonable interpretation made by" the agency. Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). One CMS regulation interpreting the comparability provision essentially paraphrases it.[5] A second CMS regulation interpreting sufficiency of "amount, duration, and scope" of services provides that, while "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose[,] . . . [t]he agency may place appropriate limits on a service based on such criteria as . . . utilization control procedures." 42 C.F.R. § 440.230(a)(2)(b), (d). By clarifying that a state may appropriately limit its provision of a service, CMS indicates that such service limitations do not per se violate the comparability provision. Using the language "on such criteria as" indicates that "utilization control procedures" are illustrative, not exhaustive, of the type of criteria by which a state may permissibly limit the provision of services.
¶ 44 CMS has provided further guidance specifically addressing a state's provision of Medicaid state-paid personal care services in shared living situations. "When an agency construes its own regulations, [judicial] deference is particularly appropriate, and even more appropriate where, as here, [the court] consider[s] a small corner of a labyrinthine statute." Skandalis v. Rowe, 14 F.3d 173, 178 (2d Cir.1994) (deferring to interpretation of Medicaid statutes and regulations advanced by the secretary of the Department of Health and Human Services). In its guide to the provision of Medicaid home care services, CMS states that, to be Medicaid-reimbursable, "services must address the beneficiary's needs. This means that services cannot be furnished if they principally benefit the `family unit.'" U.S. Dep't of Health & Human Servs., Understanding Medicaid Home and Community Services: A Primer 131 (Oct.2000) (located in Rule Making File, Gasper v. Dep't of Soc. & Health Servs., No. 04-2-01400-7, at SHS-0005 to 06). States may take into account the amount of informal care available to an individual. Id. Consideration may also be given to "the kinds of household tasks family members typically expect to share . . . when they live in the same household." Id.
¶ 45 Because the comparability provision is silent on the specific question herewhat factors may be considered when assessing the relative needs of individuals seeking Medicaid assistanceI believe that the CMS regulations and guidance interpreting the provision should be accorded this court's deference. Thus, as CMS clarifies, a state does not violate the comparability provision by giving appropriate consideration to individuals' shared living circumstances when allocating state-paid personal care services.
¶ 46 At the state level, this court interprets the meaning of statutes de novo and may substitute its interpretation for that of an agency, but if the statute is ambiguous, "`[w]here a statute is within [an] agency's special expertise, the agency's interpretation is accorded great weight.'" Port of Seattle v. Pollution Control Hearings Bd., 151 Wash.2d 568, 593, 90 P.3d 659 (2004) (alterations in original) (quoting Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 77, 11 P.3d 726 (2000)).
¶ 47 The legislature expressly charged DSHS with developing a uniform system for comprehensively assessing the need of functionally disabled individuals for medical services. See RCW 74.09.520(4); RCW 74.39.005(2). In response, DSHS developed the CARE tool, through which it evaluates eligibility for and allocates state-paid personal care services to functionally disabled individuals. *398 WAC XXX-XXX-XXXX to -0130.[6] DSHS incorporated into the CARE tool a formula for adjusting an individual's allocation of state-paid personal care services to reflect the amount of informal support that individual receives. Built into the informal support formula is consideration of the individual's shared living circumstances. Given that CMS's authoritative interpretation of the comparability provision permits consideration of such circumstances, I believe that DSHS's decision to consider shared living circumstances and its mechanism for such consideration is entitled to some measure of administrative deference. However, administrative deference, while warranted, does not itself resolve whether the shared living rule violates the comparability provision, the question to which I now turn.
B. Shared Living Rule Presumption
¶ 48 "[T]he question is whether DSHS exceeded its statutory authority by promulgating a rule that conflicts with federal law, namely [the shared living rule]." Majority at 391. "'[A]dministrative rules adopted pursuant to a legislative grant of authority are presumed to be valid and should be upheld on judicial review if they are reasonably consistent with the statute being implemented.'" Campbell v. Dep't of Soc. & Health Servs., 150 Wash.2d 881, 892, 83 P.3d 999 (2004) (alteration in original) (quoting Fahn v. Cowlitz County, 93 Wash.2d 368, 374, 610 P.2d 857, 621 P.2d 1293 (1980)). The burden of demonstrating the invalidity of an agency rule is on the party asserting the invalidity. RCW 34.05.570(1)(a); Wash. Pub. Ports Ass'n v. Dep't of Revenue, 148 Wash.2d 637, 645, 62 P.3d 462 (2003).
¶ 49 The majority reasons that the shared living rule violates the comparability provision because, as an irrebuttable presumption, the rule operates without making an individualized determination of each individual's actual need for services. Majority at 391-94. However, as I discuss below, the shared living rule is just one of the many irrebuttable presumptions in the CARE tool, a tool that does not make any individualized determinations of actual need. The majority does not articulate a principled basis upon which this court should substitute our judgment for that of DSHS in this instance with respect to the shared living rule, but refrain from doing so with respect to other presumptions in the CARE tool. In my opinion, absent that principled basis, the majority has not demonstrated that the rule's presumptive validity is overcome.
¶ 50 The majority states that the shared living rule "establishes an irrebuttable presumption that the recipient's need for assistance is met for instrumental activities of daily living (IADL) of meal preparation, housekeeping, shopping, and wood supply." Majority at 391. I agree that the shared living rule "establishes an irrebuttable presumption." However, the majority implies that in this respect the shared living rule is unique and therefore suspect. Unlike the majority, I recognize that the CARE tool is built on a framework of irrebuttable presumptions, of which the shared living rule is merely one.
¶ 51 DSHS developed the CARE tool pursuant to a legislative mandate that DSHS "[e]nsure that functional ability shall be the determining factor in defining long-term care service needs and that these needs will be determined by a uniform system for comprehensively assessing functional disability." RCW 74.39.005(2) (emphasis added). Each functionally disabled individual is unique in both disabilities and need for long-term care services. Nevertheless, DSHS was charged with developing a uniform system for assessing functional disability to support the equitable allocation of the State's all-too-limited resources across the pool of eligible recipients. The price of uniformity is that fit may be imprecise in a particular individual's circumstances.
¶ 52 In a CARE evaluation, an individual is assessed in each of four areas: "[c]ognitive performance," "[c]linical complexity," *399 "[m]ood/behaviors symptoms," and ability to perform "[a]ctivities of daily living (ADLs)." WAC XXX-XXX-XXXX. Cognitive performance is scored from "zero (intact) to six (very severe impairment)." WAC XXX-XXX-XXXX. Clinical complexity and mood/behaviors are each answered either yes or no. WAC XXX-XXX-XXXX, -0100. Ability to perform ADLs is scored from 0 to 28. WAC XXX-XXX-XXXX. Using an individual's scores in each of the four areas, the CARE tool assigns the individual to one of 14 classification groups.[7] WAC XXX-XXX-XXXX. By administrative rule DSHS has assigned to each classification group a base number of hours per month for personal care services, ranging from 29 to 420 hours. WAC XXX-XXX-XXXX.
¶ 53 Assigning an individual to a classification group is only the initial step in determining how many hours of state-paid personal care services per month the state can provide to an individual. WAC XXX-XXX-XXXX. DSHS then "deducts from the base hours to account for informal supports."[8],[9] WAC XXX-XXX-XXXX(2). The adjustment is based upon "the amount of [informal] assistance available to meet [the recipient's] needs" in performing each of nine ADLs[10] and four IADLs[11] during the seven days immediately preceding the assessment. WAC XXX-XXX-XXXX(2)(a). For each of the ADLs and IADLs, the available informal support is deemed to have not met, partially met,[12] or fully met the individual's need. As with other components in the CARE tool, the gathered information is translated into scores.
¶ 54 The shared living rule operates within the context of the deduction for informal supportwhere an individual lives together with his or her paid caregiver,[13] the individual's need for housekeeping, essential shopping, and meal preparation are presumed to be met.[14] As the majority states, the shared living rule "was implemented on the theory that if caregivers must clean their own houses, go shopping, and cook meals for their own benefit, certain duplication of efforts are presumed, and . . . a state should not pay for those tasks that benefit the entire household." Majority at 390; WAC XXX-XXX-XXXX(2)(a). A mathematical formula translates *400 an individual's total score for informal support, including the scores determined by the presumption of the shared living rule, into a percentage by which the base number of hours is reduced. WAC XXX-XXX-XXXX(2)(b). This final adjusted amount, the product of the complete CARE assessment, represents the number of state-paid personal care service hours per month for which the individual qualifies.
¶ 55 The enterprise of reducing the infinite variety of a diverse population to a set of numeric scores and yes or no answers intrinsically requires using irrebuttable presumptions. For example, DSHS has determined by rule that an individual is clinically complex only if he or she has one of a designated list of conditions in combination with the ADL score required for that particular condition. WAC XXX-XXX-XXXX. An individual with cerebral palsy and an ADL score of more than 14 is deemed clinically complex, while with a score of 14 or less he or she is not. Id. By contrast, an individual who requires dialysis need only have an ADL score of more than 10 to be deemed clinically complex. Id. An individual may request that DSHS review factual error in an assessment, e.g., dialysis is required where the assessment says it is not. But an individual cannot successfully argue that, in her particular case, having cerebral palsy plus an ADL score of 12 makes her clinically complex. Each determination that a select condition and a requisite ADL score is clinically complex or not is an irrebuttable presumption.
¶ 56 I agree with the majority that the shared living rule operates as an irrebutable presumption, but it is just one of many irrebutable presumptions that comprise the CARE tool. Irrebuttable presumptions delineate the 14 classification groups, provide the framework that translates assessment scores into those groups, and allocate the interim base number of hours to each group. The nature of a presumption is that it will not match precisely the particular circumstances of every individual to whom it is applied. But it is only through the operation of a framework of presumptions that DSHS is able to create a "uniform system for comprehensively assessing functional disability." RCW 74.39.005(2) (emphasis added). The majority's implication that the shared living rule is particularly suspect because it is an irrebutable presumption does not withstand scrutiny.
¶ 57 Having established that the shared living rule is an irrebuttable presumption, the majority then claims that the rule is invalid because "[t]o `presume' some recipients need fewer hours of care without individualized determination violates the comparability requirement." Majority at 393. This claim rests on the majority's inaccurate suggestion that "DSHS decided on individualized determinations of public assistance benefits for this categorically needy group of Medicaid recipients," only to deny individualized determinations to the respondents and others like them by applying the shared living rule. Id. at 393. In fact, the respondents are treated in the same manner as other Medicaid recipients because no recipient is individually assessed as to his or her need for housekeeping, shopping, and meal preparation.
¶ 58 Contrary to the majority's claim that "[a] recipient who does not live with a caregiver is assessed an amount needed for meal preparation, housekeeping, and shopping," but a recipient who does live with a caregiver is assessed with different criteria, id. at 393, the base number of hours allocated to each of the 14 classification groups incorporates assistance with these tasks. All recipients, whether they do or do not live with their caregivers, uniformly receive the interim base hour allocation assigned to their classification groups. Then that base number of hours is reduced in consideration of the informal support that an individual receives to meet IADL and ADL needs. DSHS never evaluates how many hours of assistance an individual actually requires to meet his or her IADL and ADL needs.
¶ 59 The majority finds it significant that the shared living rule "reduces" the initial allocation of a base number of hours, stating that "[o]nce a person is assessed to require and receive a certain number of care hours, the assessment cannot be reduced absent a specific showing that fewer hours are required." Id. at 393. However, the base *401 number of hours is not a number of hours that an individual has been specifically assessed to require-the base number is a nonspecific, interim allocation associated with the classification group, which may or may not be sufficient to meet the individual's actual needs. Additionally, the informal support adjustment likewise "reduces" the base number without a "specific showing that fewer hours are required." For example, the determination that an individual's needs are met between one-half and three-fourths of the time results in a standard percentage reduction of the base number of hours. Just as there is no initial determination of how many hours are actually required to meet the individual's needs absent informal support, there is no subsequent evaluation of whether the reduced hours are sufficient to meet the need that is unmet by informal support. Finally, the fact that the shared living rule "reduces" the base number of hours is an artifact of how the CARE tool is programmed. The CARE tool could just as easily have been designed to allocate to each classification group a lower base number of hours that would then be adjusted upward depending on access to informal support, living circumstances, and other factors.
¶ 60 As part of the informal support evaluation, if an individual lives with a paid caregiver, the shared living rule presumes that housekeeping, shopping, and meal preparation needs are fully met. On the other hand, no adjustment is made for informal support that the paid caregiver provides with ADL needs, notwithstanding that such support could be substantial, especially where the paid caregiver is also a family member or friend of the recipient. The majority's claim that "DSHS's refusal to consider the individual needs of [the respondents] for assistance with housekeeping, shopping, and meal preparation violates their right to be treated in the same manner as all other categorically needy Medicaid recipients who are individually assessed for the same needs," betrays the majority's fundamental misunderstanding of how the CARE tool operates. Majority at 393. The CARE tool does not operate by assessing each individual's particular need for assistance. The entire CARE process is based on presumptions and approximations, regardless of whether an individual does or does not live with his or her caregiver.
¶ 61 The majority even acknowledges that "DSHS may use the CARE assessment program to initially classify, rate, and determine a recipient's level of need because this process is consistent with the Medicaid program's purpose." Id. In this the majority seemingly endorses the need to employ the CARE tool's presumption-based system. However, the majority then continues, "DSHS violates the comparability requirement when it reduces a recipient's benefits based on a consideration other than the recipient's actual need." Id. (emphasis added). The CARE tool does notcannotallocate state-paid personal care services based on individuals' actual need. DSHS is charged with fairly allocating an all too limited pool of resources across a population of individuals whose needs far exceed what the State is able to provide. Each individual is unique, with unique abilities, disabilities, medical conditions, and circumstances. Given the mandate to develop a "uniform system for comprehensively assessing functional disability," RCW 74.39.005(2), DSHS is constrained to proceed by formulating a framework of presumption-defined determinations, which it has encapsulated in the CARE tool.

CONCLUSION
¶ 62 Ultimately, the majority invalidates the shared living rule "to the extent that it presumes certain needs of the recipient are met without an individualized determination and, the presumption results in an automatic 15 percent reduction in the recipient's assessed number of allotted care hours based only on the fact that the recipient lives with a caregiver." Majority at 393-94. This conclusion describes how the shared living rule operates, but not why that mode of operation renders the shared living rule invalid.
¶ 63 The majority's reasoning does not distinguish a principled basis upon which this court should substitute our judgment for that of DSHS in this instance with respect to the shared living rule, but refrain from doing so with respect to other presumptions in the CARE tool. As a properly promulgated administrative *402 rule, the shared living rule is presumptively valid and should be upheld if it is reasonably consistent with the comparability provision. In my opinion, because the majority has not demonstrated a principled basis for distinguishing between the shared living rule and other CARE tool rules, the majority has not overcome the rule's presumptive validity. This conclusion is strengthened by granting even the most minimal deference to DSHS's expertise. Therefore, I would hold that the shared living rule does not violate the comparability provision. Accordingly, I respectfully dissent.
WE CONCUR: Justice BARBARA A. MADSEN and Justice BOBBE J. BRIDGE.
NOTES
[1] We also grant Jenkins' motion passed to the merits, pursuant to RAP 10.3(8), and permit him to include as an appendix to his appellate brief excerpts from the federal guidance document on Medicaid waivers. We deny DSHS's motion passed to the merits to include as an appendix to its appellate brief documents illustrating how the shared living rule operates with respect to hypothetical recipients.
[2] The four programs are (1) medical personal care; (2) the community options program entry system (COPES) waiver program; (3) the medically needy in-home waiver program; and (4) the chore program. WAC XXX-XXX-XXXX.
[3] DSHS does not provide its reasons in the record for its initial reduction in Gasper's hours from 184 to 116 nor does it give reasons for its subsequent increase in Gasper's hours from 116 to 152 per month.
[4] Like Gasper, DSHS does not provide its reasons in the record for its initial reduction in Myer's hours from 184 to 116 nor does it give reasons for its subsequent increase in Myer's hours from 116 to 152 per month.
[5] Effective June 17, 2005, former WAC 388-72A-0095 (2004) was amended and recodified as WAC XXX-XXX-XXXX(3)(b).
[6] The MNIW waiver application is not present in the record, nor is it discussed by the parties in their briefing so we limit our finding to the COPES program.
[7] RCW 74.08.080(3) states: "When a person files a petition for judicial review . . . of an adjudicative order entered in a public assistance program, no filing fee shall be collected . . .; the event that the superior court, the court of appeals, or the supreme court renders a decision in favor of the appellant, said appellant shall be entitled to reasonable attorneys' fees and costs."
[8] Jenkins asks this court to review the trial court's ruling denying fees and costs for co-counsel. However, Jenkins did not cross-appeal any of the superior court's rulings; thus, the issue is not properly before this court.
[1] Former WAC 388-72A-0095 (2004), amended and recodified at WAC XXX-XXX-XXXX(3)(b) (2005).
[2] Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
[3] The comparability provision requires that a state Medicaid plan must provide:

(B) that the medical assistance made available to any individual described in subparagraph (A)
(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and
(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A).
42 U.S.C. § 1396a(a)(10)(B) (emphasis added).
Subparagraph A defines the categories of individuals to whom a state must provide medical assistance as part of its Medicaid plan, 42 U.S.C. § 1396a(a)(10)(A)(i), and to whom a state may provide assistance if it chooses. 42 U.S.C. § 1396a(a)(10)(A)(ii).
[4] Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 651 n. 3, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003).
[5] 42 C.F.R. § 440.240 provides:

(b) The plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all recipients within the group:
(1) The categorically needy.
(2) A covered medically needy group.
[6] The WAC provisions dealing with long-term care services, including the CARE assessment tool, former chapter 388-72A WAC (2004), were recodified at chapter 388-106 WAC. Wash. St. Reg. XX-XX-XXX (June 17, 2005). This opinion cites to the current WAC provisions which are substantially the same as the provisions in place when respondents were evaluated.
[7] The majority states that the CARE "scores are put into a formula that calculates the individual's base assistance level in hours of care, and places the individual into one of 14 residential classification groups." Majority at 389. This explanation suggests, inaccurately, that a base number of required care hours is calculated for each individual directly from that individual's CARE scores, through an individualized determination process. To the contrary, CARE scores are used to assign an individual to one of the 14 groups. Each group has been designated a base number of hours. That base number is then adjusted depending on the individual's circumstances.
[8] An "`[i]nformal support'" is "a person or resource that is available to provide assistance without home and community program funding." WAC XXX-XXX-XXXX.
[9] DSHS may also add hours based on an individual's living environment, in consideration of the individual's distance from essential services (laundry, shopping) and exclusive reliance on wood for heat. WAC XXX-XXX-XXXX(4).
[10] The nine ADLs assessed for the availability of informal support are (1) self-administration of medications, (2) bed mobility, (3) transfer, (4) walk in room, (5) eating, (6) toilet use, (7) dressing, (8) personal hygiene, and (9) bathing. WAC XXX-XXX-XXXX. This list shares ADLs in common with, but is not identical to, the activities considered in assessing an individual's ADL score, used in assigning an individual to a classification group. WAC XXX-XXX-XXXX.
[11] The four IADLs assessed are meal preparation, ordinary housework (including laundry), essential shopping, and travel to medical. WAC XXX-XXX-XXXX(2); see also WAC XXX-XXX-XXXX (defining "[o]rdinary housework" as "doing dishes, dusting, making bed, tidying up, laundry").
[12] The assessment of partially met is further subdivided into four quartiles of (1) less than one-fourth of the time, (2) between one-fourth and one-half of the time, (3) between one-half and three-fourths of the time, and (4) more than three-fourths of the time. WAC XXX-XXX-XXXX(2).
[13] The shared living rule also applies if an individual lives together with another individual receiving state-paid personal services. WAC XXX-XXX-XXXX(3)(a).
[14] The majority suggests that "[i]f the recipient lives with a caregiver, a second formula is applied to reduce the number of care hours for which the recipient qualifies." Majority at 389. This is inaccurate. The shared living rule is applied within the adjustment for informal supports, using the same formula. WAC XXX-XXX-XXXX.