[No. 35219-2-II. Division Two. September 18, 2007.]

JAMES TOMLINSON, *Appellant*, v. PUGET SOUND FREIGHT LINES, INC., ET AL., *Respondents*.

---

846

*Terry J. Barnett*, for appellant.

*Jerald P. Keene*; and *Michael H. Weier* (of *Reinisch Weier & Mackenzie, PC*), for respondents.

¶1 ARMSTRONG, J. — James Tomlinson fell down a flight of stairs and injured his arthritic left knee while working for Puget Sound Freight Lines, Inc. (PSFL). After total knee replacement surgery, he filed a claim for permanent partial disability compensation under the Industrial Insurance Act.[1] Three orthopedic surgeons opined that Tomlinson's left knee merited a 75 percent permanent partial disability award. The doctors also agreed that degenerative arthritis in Tomlinson's knee caused a preexisting 50 percent permanent partial disability. Accordingly, the Department of Labor and Industries (Department) awarded Tomlinson a permanent partial disability payment of 75 percent of the amputation value of his left leg above the knee, less the preexisting 50 percent attributable to his arthritis, following RCW 51.32.080(5). The Board of Industrial Insurance Appeals (Board) affirmed, and the Pierce County Superior Court granted summary judgment for PSFL, affirming the Department's decision allowing the 50 percent credit. On appeal, Tomlinson advances several reasons why the De-

---

[1] Title 51 RCW.

partment erred in finding that he had a 50 percent permanent partial disability in his knee before the industrial accident. Finding no error, we affirm.

## FACTS

¶2 James Tomlinson sustained an industrial injury when he fell down a flight of stairs while working as a dispatcher for PSFL. The injury caused trauma to his left knee and eventually necessitated total knee replacement surgery.

¶3 After the initial knee replacement surgery failed, Tomlinson underwent a second total knee replacement operation. Dr. John Jiganti evaluated Tomlinson after his second total knee replacement surgery and determined that he should have a permanent partial disability rating examination. Drs. Jiganti, David Chaplin, and James B. Smith agreed that Tomlinson's poor surgical result following the second total knee replacement merited a permanent partial disability award of 75 percent of the value of the left leg above the knee joint with short thigh stump. The doctors agreed that the poor surgical result accounted for 100 percent of the permanent partial disability.

¶4 Tomlinson had first developed knee problems while in the Air Force in the 1960s. He received some medical treatment for his left knee in the 1990s as well as some disability compensation from the Veterans Administration. Medical records and x-rays from the 1990s showed that at the time of the industrial injury, Tomlinson suffered from degenerative arthritis in both of his knees. Drs. Chaplin and Smith determined—and Dr. Jiganti agreed—that Tomlinson's degenerative arthritis caused a 50 percent impairment in his left knee.

¶5 The Department accepted the 75 percent disability rating, but it offset Tomlinson's disability award by the 50 percent preexisting impairment that the arthritis in his left knee caused. An industrial appeals judge (IAJ) affirmed the Department's order, and the Board denied Tomlinson's

petition for review and adopted the IAJ's proposed decision and order. Tomlinson appealed the Board's order to the Pierce County Superior Court.

¶6 At the superior court, Tomlinson moved for summary judgment, arguing that the Department incorrectly calculated his disability award because at the time the Department determined the extent of his permanent partial disability, his arthritic knee had been removed and replaced with a prosthetic knee. The trial court rejected Tomlinson's legal theory and denied his summary judgment motion. Counsel for Tomlinson and PSFL then agreed that the motion was dispositive and that the case need not proceed to trial. Tomlinson appeals the trial court's denial of his summary judgment motion.

¶7 RCW 51.32.080(5) directs the Department to take into account any preexisting permanent partial disability to the same body part injured in an industrial accident when the Department awards permanent partial disability compensation. Here, three expert witnesses testified that Tomlinson's preexisting degenerative arthritis caused a 50 percent impairment. The question is whether the Department, the Board, and the trial court erred in applying RCW 51.32.080(5) to offset Tomlinson's permanent partial disability award by the percentage of disability attributable to his degenerative arthritis—a question of law.

## ANALYSIS

### I. Standard of Review

¶8 We review questions of statutory interpretation de novo. *Jenkins v. Dep't of Soc. & Health Servs.*, 160 Wn.2d 287, 296, 157 P.3d 388 (2007).

¶9 We construe the Industrial Insurance Act liberally to reduce to a minimum the suffering and economic loss arising from injuries or death in the course of employment. RCW 51.12.010. Accordingly, where reasonable minds can differ over the meaning of the act's provisions, we resolve all

doubts in the injured worker's favor. *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 811, 16 P.3d 583 (2001) (quoting *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d 467, 470, 745 P.2d 1295 (1987)).

II. INTERPRETATION OF PERMANENT PARTIAL DISABILITY UNDER RCW 51.32.080(5)

██ ██ ¶10 Our objective in interpreting a statute is to ascertain and carry out the legislature's intent and purpose in creating the statute. *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (2002) (citing *State v. Sullivan*, 143 Wn.2d 162, 174-75, 19 P.3d 1012 (2001)). To determine legislative intent, we first look to the statute's language. *Tenino Aerie*, 148 Wn.2d at 239. If the language is unambiguous, we look no further. *Am. Disc. Corp. v. Shepherd*, 160 Wn.2d 93, 98, 156 P.3d 858 (2007) (citing *Wash. State Coal. for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 904, 949 P.2d 1291 (1997)); *see also Cerrillo v. Esparza*, 158 Wn.2d 194, 202, 142 P.3d 155 (2006) (courts confine restrictions on statutory remedies to their plain terms (quoting *Drinkwitz v. Alliant Techsystems, Inc.*, 140 Wn.2d 291, 301, 996 P.2d 582 (2000))).

¶11 RCW 51.32.080(5) provides:

Should a worker receive an injury to a member or part of his or her body already, from whatever cause, permanently partially disabled, resulting in the amputation thereof or in an aggravation or increase in such permanent partial disability but not resulting in the permanent total disability of such worker, his or her compensation for such partial disability shall be adjudged with regard to the previous disability of the injured member or part and the degree or extent of the aggravation or increase of disability thereof.

¶12 Tomlinson argues that the degenerative arthritis in his knee did not render his leg "already . . . permanently partially disabled" under RCW 51.32.080(5). Reply Br. of Appellant at 18. He offers four reasons why the Department

erred in finding otherwise: (1) the evidence was insufficient to prove that he was disabled before the work injury; (2) no physician rated his knee with a permanent disability before his workplace injury; (3) his arthritic condition was progressive and, therefore, not fixed and stable as the concept of *permanent* requires; and (4) the first knee surgery removed all the arthritis and, thus, he had no disabling arthritis at the time the Department accepted his 75 percent disability.

## 1. *Partial Disability*

¶13 Tomlinson maintains that his knee symptoms before the work injury and the fact that doctors told him he would eventually need a knee replacement do not establish a preexisting partial disability. We disagree.

¶14 Under Washington's Industrial Insurance Act, a "partial disability" is a partial incapacity to work based on objective physical or clinical findings establishing a loss of function. *Williams v. Va. Mason Med. Ctr.*, 75 Wn. App. 582, 586, 880 P.2d 539 (1994) (citing *Dowell v. Dep't of Labor & Indus.*, 51 Wn.2d 428, 433, 319 P.2d 843 (1957)); *see also Henson v. Dep't of Labor & Indus.*, 15 Wn.2d 384, 391, 130 P.2d 885 (1942) ("disability" means the impairment of the workman's mental or physical efficiency).

¶15 Dr. Jiganti, the orthopedic surgeon who treated Tomlinson after his injury, testified that because of the advanced arthritis, Tomlinson likely suffered pain when using the knee immediately before the injury. Dr. Jiganti also said that one side effect of pain could be limited use of the affected body part.

¶16 Dr. Chaplin, an orthopedic surgeon who evaluated Tomlinson several years after the industrial injury, testified that Tomlinson had arthritis in his knee before his fall. Dr. Chaplin also testified that Tomlinson's medical records showed that Tomlinson had painful joints in both knees for the last 10 to 15 years, that doctors drained his left knee in 1974, and that both knees would occasionally lock and interfere with his mobility. He testified that most of the

cartilage in Tomlinson's knee had deteriorated, leading to bone-on-bone contact, and that bone-on-bone contact implies stiffness, pain with weight-bearing, and pain with motion. According to Dr. Chaplin, the American Medical Association guides provide that Tomlinson's lack of cartilage in his knee joint (bone-to-bone contact) constituted a 50 percent impairment.

¶17 Dr. Smith, an orthopedic surgeon who also evaluated Tomlinson some time after the industrial injury, testified that Tomlinson had advanced arthritis in his knee, which more likely than not caused pain and functional impairment before the work injury. Dr. Smith agreed that Tomlinson's condition before the industrial injury resulted in a 50 percent lower extremity impairment.

¶18 The orthopedic surgeons' testimony sufficiently establishes Tomlinson's partial loss of function in his left knee and supports the IAJ's finding that Tomlinson had symptomatic, advanced degenerative arthritis in his left knee at the time of the industrial injury. *See Williams*, 75 Wn. App. at 586.

¶19 In addition, the IAJ found that Tomlinson's degenerative arthritis was disabling before the work injury. Tomlinson has not challenged this finding, and when he stipulated that the trial court's summary judgment ruling left no issues to be tried, he waived any challenge to the IAJ's findings.

¶20 This case is analogous to *Beyer v. Department of Labor & Industries*, 17 Wn.2d 29, 32, 134 P.2d 948 (1943), where our Supreme Court held that, in applying an earlier but similar version of RCW 51.32.080(5),[2] the Department correctly reduced the amount of the claimant's ultimate

---

[2] The statute involved in *Beyer*, which is nearly identical to the current RCW 51.32.080(5), stated:

> "Should a workman receive an injury to a member or part of his body already from whatever cause permanently partially disabled, resulting in the amputation thereof or in an aggravation or increase in such permanent partial disability but not resulting in the permanent total disability of such workman, his compensation for such permanent partial disability shall be adjudged with

partial disability compensation by the amount attributable to a preexisting injury. The plaintiff in *Beyer* suffered an injury at work that rendered him blind in one eye but did not file a claim to receive compensation for that injury. *Beyer*, 17 Wn.2d at 29-30. Several years later, the plaintiff reinjured the same eye at work, necessitating removal of his eye. *Beyer*, 17 Wn.2d at 30. The plaintiff filed a claim under the "workmen's compensation act" seeking compensation for the loss of his eye. *See Beyer*, 17 Wn.2d at 30.

¶21 The relevant workmen's compensation statute then compensated an injured worker $1,440 for the loss of one eye by enucleation and $1,080 for the loss of sight of one eye. *Beyer*, 17 Wn.2d at 30. The supervisor of industrial insurance held that since the plaintiff was blind in the eye he lost, he should receive the difference between the compensation provided for the loss of one eye by enucleation and the amount awarded for loss of sight of one eye. *Beyer*, 17 Wn.2d at 30. On appeal, the trial court reversed, ruling that the plaintiff should receive the full award for losing his eye. *Beyer*, 17 Wn.2d at 30.

¶22 Our Supreme Court then held that RCW 51.32-.080(5) applied because the plaintiff's original injury rendered him permanently partially disabled but did not result in permanent total disability. *Beyer*, 17 Wn.2d at 31. The court concluded that the plaintiff's original injury rendered him permanently partially disabled even though he had not filed a compensation claim for the first injury. *See Beyer*, 17 Wn.2d at 30-31. The court held that the Department properly deducted the amount of compensation the worker was entitled to for the first disability from the final disability payment. *Beyer*, 17 Wn.2d at 32.

█ ¶23 Similarly, in the present case, the Department correctly applied and interpreted RCW 51.32.080(5), which directed the Department to consider Tomlinson's preexist-

---

regard to the previous disability of the injured member or part and the degree or extent of the aggravation or increase of disability thereof."
*Beyer*, 17 Wn.2d at 31 (quoting Laws of 1927, ch. 310, at 844).

ing permanent arthritic condition in fixing Tomlinson's ultimate disability compensation.

¶24 Tomlinson distinguishes *Beyer* on the grounds that the parties in that case agreed that the plaintiff's loss of sight constituted a permanent disability. He claims that his degenerative arthritis was not permanent and that, therefore, the Department erred in applying RCW 51.32.080(5).

## 2. *Permanence*

¶25 Tomlinson argues his previous arthritic condition was not permanent. First, he maintains that no physician rated him for a permanent partial disability before the work injury. To the extent this is a challenge to the sufficiency of the evidence, Tomlinson waived the argument by stipulating that no issues remained for trial after the summary judgment ruling. And Tomlinson cites no authority for the proposition that the Department cannot legally find a preexisting disability absent a contemporary medical rating, which is typically obtained only for work injuries. The language of the statute covering preexisting permanent disabilities "from whatever cause" suggests that the legislature intended RCW 51.32.080(5) to apply to all previous disabilities, not just those caused by work injuries.

¶26 Tomlinson also argues that his degenerative arthritis was not permanent because it was progressive, not fixed and stable. Alternatively, he argues that a disability is not permanent if it is amenable to treatment. Tomlinson maintains that doctors "treated" his degenerative arthritis through a total knee replacement, where they removed his knee and the arthritis. Reply Br. of Appellant at 17.

¶27 The legislature did not define "permanently" or "permanent" in the Industrial Insurance Act.[3] Where a statute fails to define a particular term, we give the term its

---

[3] The act does define a "permanent partial disability" in general, *see* RCW 51.08.150 ("the loss of either one foot, one leg, one hand, one arm, one eye, one or more fingers, one or more toes, any dislocation where ligaments were severed where repair is not complete, or any other injury known in surgery to be permanent partial disability"), but this definition is not helpful to the issue here.

plain and ordinary meaning, keeping in mind the statute's context as a whole. *McClarty v. Totem Elec.*, 157 Wn.2d 214, 225, 137 P.3d 844 (2006) (citing *One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs., Inc.*, 148 Wn.2d 319, 330, 61 P.3d 1094 (2002)). And while we may resort to a dictionary for a statutory term's meaning, *see McClarty*, 157 Wn.2d at 225 (citing *Schrom v. Bd. of Volunteer Fire Fighters*, 153 Wn.2d 19, 28, 100 P.3d 814 (2004)), we avoid strict, literal interpretations that result in absurd or strained consequences that the legislature most likely did not intend. *Tenino Aerie*, 148 Wn.2d at 239 (citing *State v. McDougal*, 120 Wn.2d 334, 350, 841 P.2d 1232 (1992)).

¶28 Tomlinson argues that his former degenerative arthritic condition does not fit the dictionary definition of "permanent" as "continuing or enduring (as in the same state, status, place) without fundamental or marked change : not subject to fluctuation or alteration : fixed or intended to be fixed." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1683 (2002). He reasons further that because his arthritis was progressive, it was not fixed or stable and thus does not fall within our definition of "permanent" in *Summers v. Great Southern Life Insurance Co.*, 130 Wn. App. 209, 216, 122 P.3d 195 (2005) (defining "permanent" as " 'a state of indefinite continuance, . . . something incapable of alteration, fixed, or immutable' " (alteration in original) (quoting 1C JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 641, at 206 (1981))), *review denied*, 157 Wn.2d 1025 (2006). *See also Hiatt v. Dep't of Labor & Indus.*, 48 Wn.2d 843, 845-46, 297 P.2d 244 (1956) (a person whose condition is remediable is not permanently disabled, and a disability should not be declared permanent unless it appears that the affliction will not yield to treatment); *Shea v. Dep't of Labor & Indus.*, 12 Wn. App. 410, 415, 529 P.2d 1131 (1974) (a disabling condition is permanent when "no longer remedial and its character has expectedly an un-

changeable existence"), *review denied*, 85 Wn.2d 1009 (1975).[4]

¶29 Drs. Jiganti, Chaplin, and Smith agreed that Tomlinson suffered from severe degenerative arthritis. Tomlinson is correct that a degenerative condition, by definition,[5] is not fixed and stable. But the strict, literal interpretation of the term "permanent" that Tomlinson advances produces a strained result that the legislature most likely did not intend with RCW 51.32.080(5). *See Tenino Aerie*, 148 Wn.2d at 239. We conclude that the statutory meaning of "permanent" for purposes of RCW 51.32.080(5) focuses on whether the condition is curable; the legislature did not intend to exclude incurable preexisting disabilities that continue to worsen. Dr. Smith testified that cartilage is unable to repair itself, and other medical experts testified that advanced erosion of cartilage in the knee implies stiffness, pain with weight bearing, and pain with motion. This testimony established that Tomlinson's degenerative arthritis was permanent as that term is used in RCW 51.32.080(5).

¶30 Still, Tomlinson contends that although his arthritis would have been permanent if left untreated, his arthritis was merely temporary because it was "treatable" by removal through a total knee replacement. Reply Br. of Appellant at 17.

---

[4] Tomlinson also claims that under the Department's regulations, a permanent partial disability is a disabling condition that is "determined to be stable or *non*progressive" and that since his arthritis was progressive, it was not a permanent partial disability. Br. of Appellant at 23. Tomlinson cites WAC 296-20-01002 for this proposition, but in 2002 that definition was moved to a new section, WAC 296-20-19000, which deals with "permanent partial disability *award*[s]." (Emphasis added.) Moreover, "permanent partial disability" in RCW 51.32.080(5) includes preexisting conditions *not* submitted for an award and defines the disability in the context of when a worker's condition has reached maximum medical improvement. Finally, neither party has briefed whether WAC 296-20-19000 applies to Tomlinson's preexisting condition. Because of these distinctions and the lack of briefing, we decline to consider whether the WAC applies here.

[5] "Degenerate" means "to descend to a markedly worse condition in kind or degree." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 593 (2002).

¶31 But RCW 51.32.080(5) refers to permanent partial disability existing at the time of the work injury, not at the time the final disability is rated. And Tomlinson had degenerative arthritis when he fell at work. Moreover, the statute applies to work injuries that result "in the amputation thereof," referring to the partially disabled body part. Thus, a worker with a disabling bone, muscle, or nerve condition of the work-injured limb that is amputated because of the work injury comes within the statutory credit scheme. Yet in such cases, the amputation would remove the existing bone, muscle, or nerve condition and, according to Tomlinson's argument, would cure the condition. We disagree with this strained statutory interpretation, which we can avoid by applying the statute's clear words: the credit applies to disabilities the worker has at the time of the work injury, not after treatment for the injury. Accordingly, Tomlinson's surgical amputation of his knee did not cure his preexisting arthritis that rendered him 50 percent disabled at the time of the injury. The Department correctly applied RCW 51.32.080(5) in calculating Tomlinson's permanent partial disability award.

¶32 Tomlinson requests reasonable attorney fees pursuant to RCW 51.52.130. Because we affirm the decision and order of the Board, this request is denied.

¶33 Affirmed.

VAN DEREN, A.C.J., and PENOYAR, J., concur.

Review granted at 163 Wn.2d 1039 (2008).