[No. 26949.   Department Two.   May 18, 1938.]

C. V. WILDER, *Respondent,* v. GEORGE V. NOLTE *et al., Appellants.*[1]

[1]Reported in 79 P. (2d) 682.

*Thomas & Keplinger,* for appellants.
*Walter B. Whitcomb,* for respondent.

ROBINSON, J.—On October 15, 1935, Wilder & Montfort, a partnership composed of C. V. Wilder and Louis Montfort, contractors, made a bid on a public road job involving the construction of a concrete overcrossing designed to carry state road No. 15 across the tracks of the Great Northern Railway Company near Index. Upon the opening of the bids, their bid of $31,416 proved to have been the lowest submitted, and they were awarded the contract designated as "Washington State Highway Contract No. 2059." Within a few days after the opening of the bids, the following instruments were executed by Wilder & Montfort and George V. Nolte:

"AGREEMENT

"This agreement made and entered into this 19th day of October, A. D. 1935.

"BETWEEN C. V. Wilder and Louis Montfort of Blaine, Wash., doing business under the name of Wilder & Montfort, of the one part.

and

'George V. Nolte of Bellingham, Wash., of the other part.

"WITNESSETH AS FOLLOWS:—

"That whereas Wilder & Montfort have been awarded a contract by the Washington State Highway Department to build an overhead crossing near Index, Wash., under Contract No. 2059.

"The said George V. Nolte agrees to devote his undivided time as Superintendent of the said contract for the following consideration:—namely, the sum of Two Hundred Dollars ($200.00) per month, while the job is in operation, and for his special efforts he shall receive a bonus computed as follows:—After deducting Five per cent (5%) of the Final Contract price from the Net Profit, the balance of the Net Profit shall be paid to George V. Nolte when final payment is made by the State of Washington to the said Wilder & Montfort.

"In Witness Whereof the said parties have affixed their signatures.

"WILDER & MONTFORT
By C. V. Wilder
GEO. V. NOLTE"

"GUARANTEE

"THIS GUARANTEE made and entered into this 19th day of October, 1935, by George V. Nolte of Bellingham, Wash.

"WITNESSETH THAT:—For and in consideration of that certain bonus agreement made and entered into between Wilder & Montfort of Blaine, Wash., and George V. Nolte of Bellingham, Wash.

"The said George V. Nolte agrees to hold Wilder & Montfort harmless from all losses that might be sustained by reason of the operation of constructing an overhead crossing near Index, Wash., said crossing being covered by the Washington State Highway Contract No. 2059, and he is firmly bound to Wilder & Montfort for the sum of Five per cent (5%) of the Final Contract price, and any losses that might accrue.

"It is the intent of this instrument to guarantee Wilder & Montfort, a net profit of Five per cent (5%) on the said Contract No. 2059; and to accomplish the foregoing, the said George V. Nolte is to have a free hand in the management of this contract, until such time as the contract is completed, or to the time that it is evident that losses are being sustained, at which time Wilder & Montfort may take over the management and complete the Contract.

"Any such cancellation by Wilder & Montfort will

4

not relieve the said George V. Nolte of his guarantees above.

"Any amounts due Wilder & Montfort by reason of this guarantee, are due and payable at the time of final acceptance of the said Contract by the State of Washington.                                                             GEO. V. NOLTE

"Witness
R. BECKETT."

The foregoing instruments, although executed on the date shown therein, are written memoranda which, read together, evidence an oral agreement actually entered into on the afternoon of October 14th or the morning of October 15th—at any rate, at a time prior to the filing of the Wilder & Montfort bid.

It cost Wilder & Montfort more than forty thousand dollars to perform contract No. 2059, and this action was brought against Nolte by Wilder, as successor in interest to the partnership, to recover on the contract evidenced by the memoranda above quoted.

The principal issues in the case were as to the alleged illegality of the agreement sued upon. The defendants asserted its illegality on two grounds: (1) That the contract amounted to an agreement to violate a provision of contract No. 2059 forbidding assignment or subletting; and (2) the agreement tended to suppress competition in bidding. The trial court rejected the defendants' contentions as to illegality and entered judgment for the plaintiff. The court's ruling as to these matters is made the principal basis of this appeal. We shall first dispose of the minor assignments.

The amount of recovery, if any recovery should be allowed, had been agreed upon by the parties prior to the trial, except with respect to a small item involving but a few hundred dollars. The plaintiff, Wilder, was called as a witness on his own behalf and testified strictly with reference to matters involving

that item. The defendants demanded that contract No. 2059 be introduced in evidence. Counsel for plaintiff insisted that its introduction was not necessary to his case, although it might be necessary to the maintenance of the defendants' defense. Yielding, however, to counsel's insistence, he offered the contract and it was admitted and marked plaintiff's exhibit "C", whereupon defendants insisted upon the privilege of cross-examining Mr. Wilder concerning it. This, upon objection, the trial court refused to permit, suggesting, however, that Wilder might be called as an adverse witness to support the theory of the defense. This was afterwards done.

The ruling of the court refusing the defense permission to cross-examine Wilder as to the contract is assigned as reversible error. We think no error was committed in this regard. *Grist v. Schoenburg,* 115 Wash. 335, 197 Pac. 35.

It is also assigned that the court erred in not sustaining the defendants' motion challenging the sufficiency of the evidence and asking for a dismissal of the action, with prejudice, after the plaintiff rested his case. The defendants did not stand upon their motion, but proceeded to introduce evidence in support of their defense. They are therefore in no position to assign error with respect to that ruling. *Kohout v. Brooks,* 185 Wash. 4, 52 P. (2d) 905.

We come now to the major questions presented by the appeal. We find it unnecessary to devote any time to the proposition that courts will not lend their aid to the enforcement of illegal contracts. That is not only elementary, but is here undisputed. The issue here is whether or not the contract was of the type which, under that rule, should not be enforced.

It appears in the decided cases that courts have uniformly refused to lend their aid to the enforcement

of contracts whose direct and necessary tendency is to promote a fraud. When that appears, they pay little or no attention to evidence tending to show that no fraud was in fact intended or committed. Such contracts may be roughly referred to as contracts illegal *per se.*

Perhaps the leading case of that type, concerning agreements between bidders on public contracts, is *McMullen v. Hoffman,* 174 U. S. 639, 43 L. Ed. 1117, 19 S. Ct. 839. The city of Portland was about to construct works necessary to bring water into the city from a distant river. The work was divided into various classifications; that is, there were to be separate bids for the headworks and the pipe line, and so on. McMullen, a resident of San Francisco and manager of a large contracting company, went to Portland, and, after many interviews with Hoffman, of Hoffman and Bates, local contractors, it was agreed that each of them should put in separate bids in his own, or in his firm, name, and that they should have a common, but secret, half interest in any of the bids which might be accepted. For a certain portion of the work, McMullen's firm, in accordance with this agreement, bid $514,664; Hoffman's firm, $465,667. Of the eight bids submitted, McMullen's firm was about midway between the highest and the lowest. Hoffman's firm was the lowest. The Hoffman firm was awarded the contract. The agreement to share profits and losses was then reduced to writing. The Hoffman firm made a profit of $140,000. McMullen sued on the contract for one-half of this profit and was met with the defense of illegality. The court approached the question in this way:

"Upon these facts the question arising is whether a contract between the parties themselves such as is above set forth is illegal? In order to answer the ques-

tion we would first naturally ask what is its direct and necessary tendency?"

As a result of such examination, the court said that the direct and necessary tendency of the agreement was to (1) give an impression of competition where there was in fact collusion; (2) to foster the impression that the lower bid was in all probability reasonable and thus induce the city to forego its right to reject all bids. It accordingly concluded that the contract had a direct and necessary tendency to promote fraud and was therefore one to the enforcement of which a court should not lend its aid at the suit of either party.

The trial court was of the opinion that the contract sued upon in this case was not illegal *per se*. We are likewise of that opinion. Reading both instruments evidencing the agreement together, it appears that it was agreed that Wilder & Montfort should bid on the contract; that, if they secured it, Nolte should become their superintendent at a wage of two hundred dollars per month. He was also to receive a bonus if he earned a profit of more than five per cent for his employer. In order to secure this employment, Nolte agreed to guarantee not only that he would make a five per cent profit for his employers, but would also guarantee them against any loss which they might suffer from making and performing the contract. Of course, under such circumstances, one would expect Nolte to be given a free hand in the execution of the work, and this was done. The contract is, on its face, one of employment, although the terms of payment are unusual; but we see nothing in it, it being admitted that Nolte was an experienced and competent man, which had a direct or necessary tendency to wrong or defraud the state.

Appellants insist, however, that there are col-

lateral facts which show that the contract was actually entered into for that purpose. In their argument on this branch of the case, the appellants point out that contract No. 2059 contained, by reference, the following provision:

"Contractors shall not let, assign or transfer this contract, or any interest therein, or any part thereof, without the consent in writing of the director of highways."

It is argued that the contract is illegal upon the ground that it constituted a preexisting agreement to violate that provision. In this connection, the appellants rely strongly upon the case of *DeVita v. Loprete*, 77 N. J. Eq. 533, 77 Atl. 536, Ann. Cas. 1912A, 362. This case, like the case of *McMullen v. Hoffman, supra*, is a case involving more than one bid. Three parties bid, after having agreed that, if either secured the contract, each of the others should have a right to one-third of its profit; that is, the bids were collusive. The provision concerning assignment was more drastic and comprehensive than in the case at bar, and the court found that the contract sued upon was tainted with illegality because it amounted to a contract to violate another contract, if and when the second contract should be awarded to any of the parties.

We think it is clear that, in this case, the parties neither violated nor agreed to violate the non-assignment provision of the road contract. The agreement sued upon did not contemplate that there should be a change of parties or responsibilities with respect to contract No. 2059, and no such change ever took place. Wilder & Montfort assumed the full legal responsibility of performing the contract and they completely performed it. The partnership was at all times responsible to the state, and Nolte never became so; that is, he did not in any sense come into contractual relation with the state by assignment or transfer. There was no sub-

letting. The "interest" referred to in the contract provision under discussion is a proprietary interest. Nolte never acquired such an interest, nor did the agreement sued upon ever contemplate that he should.

Appellants' next contention is that the contract, in fact, operated to suppress competition. It is contended that, if the contract sued upon had not been made, the state would have had the advantage of competitive bids from both Wilder & Montfort and Nolte. It may well be doubted whether or not a secret agreement between two contractors to make, in the name of but one of them, a bid in which they should have a joint interest, could be held to be such a suppression of competition as to warrant a court in refusing to lend its aid to the silent partner in his attempt to enforce the joint adventure or partnership contract. If such an agreement would not be illegal, it would seem that it would not be illegal for two contractors to agree that one should bid and that, if he was awarded the contract, the other should be employed to superintend the work. But we need not decide these questions as a matter of law, for the case went off on a question of fact. The trial court found, among other things:

"*That there was no intent or design* on the part of either Wilder & Montfort or of George V. Nolte in bidding or entering into either the contract with the State or between the parties, *to injure or defraud the State of Washington* or anyone; *nor was any bidding suppressed,* nor was the State injured; and Wilder & Montfort did not receive or obtain any advantage over other bidders upon the contract with the State." (Italics ours.)

We have examined the evidence bearing upon this finding with particular care. It appears from the testimony of both Wilder and Nolte that, some little time before the Index job was announced, Wilder furnished Nolte a certified check to be used in making a bid on a

road project in eastern Washington called the Rimrock job. The bid was to be made in Nolte's name, but the parties were to be interested as partners. This bid was not accepted. Wilder and Nolte both testified that, two or three weeks before the Index job was to be let, Wilder called at Nolte's house, and that he had with him a set of the Index plans and another set of plans covering a road project at Enumclaw. They went to Index, where Mr. Nolte made a careful examination of the site for the overcrossing. Mr. Wilder took little or no interest in that examination. They then drove to Enumclaw, where Mr. Wilder made an intensive examination. Mr. Nolte was asked whether during this trip he discussed the Index job with Mr. Wilder. He replied:

"Very little. He said he was interested in the Enumclaw job. It is a grading job. I had a shovel, and I had an idea if Mr. Wilder got the job I might be able to rent the shovel. Mr. Wilder was interested, and I was interested also, and we went up and spent a great deal of time. We went up through the woods, and I drove the car for Mr. Wilder, and we looked up borrow sites and so on. . . . On the road back to Bellingham I asked Mr. Wilder to borrow these [Index] plans from him."

Nolte testified that he took the Index plans and figured out the estimates for the various classes of work. He proved by other witnesses that he got prices on steel, lumber, cement, costs of producing sand and gravel from the river, and rental prices on some machinery. He testified that he did all these things in expectation of bidding on the Index job. He further testified that, on October 14th, Mr. Wilder came to his home quite early and invited him to go to Olympia.

"He asked me to come on down and put a bid in on the Index job, and I inquired at that time if it would be a similar arrangement to the Rimrock highway, and he

said we will discuss the matter on the road to Olympia, . . ."

He further testified that he and Mr. Wilder then went to Everett, where Mr. Wilder submitted a bid on a county job, and from Everett to Enumclaw, where Mr. Wilder put in considerable time completing his estimates on the Enumclaw job, and then went to Olympia, arriving about 8:30 in the evening. On the way down, they discussed the Index job:

"It was my idea it was going to be a partnership when we started, and Mr. Wilder said, no we are going to work it a little different, and he submitted to me various phases of it, and we discussed the matter in the car, and Mr. Wilder said, 'Well, we will be willing to finance this to the extent of $4000.00.' Well, I told him that would be out, because there would be certain periods of the job requiring more than $4000.00 and there would be no use starting to finance the job at that stated amount, and we finally arrived at a basis of understanding."

At another point in his evidence, Mr. Nolte related the story as follows:

"Mr. Wilder stopped at the house and I went out to the car, and he wanted to know if I was going to Olympia, and I said later, and he said, *are you going to bid on the job,* and *I said, well—I gave him a kind of half hearted answer, and he said, come on down and bid the job.* I have a check and we will work out something, and I said, well, similar to the Rimrock job, and he said, no we will work it out different, and I wanted to know how at that time I would come in on the picture, and he said, well we will put up the money, and he tried to limit it to $4000.00. He said, we will bid this job; you won't bid the job, and I said where will I come in, and he said we will use your figures and put the bid in on that, and it was talked this superintendency which I have told about." (Italics ours.)

He then went on to relate that they had arrived at the agreement that evening or the next morning, and

the bid was put in in the name of Wilder & Montfort, using his estimates and figures, Mr. Wilder furnishing the two thousand dollar bid check; that the bid was low by the sum of three thousand dollars; and that they prepared the instruments quoted at the beginning of this opinion three or four days thereafter. On cross-examination, Mr. Nolte testified, in part, as follows:

"Q. Why did you enter into a contract with Mr. Wilder in regard to this matter, Mr. Nolte? A. Why? Q. Yes. A. It looked like a pretty good deal when he put it up. Q. You thought it was a good deal for you? A. I thought it was fair, yes."

At another stage of the trial, Mr. Nolte testified as follows:

"Q. Why did you enter into this contract with Mr. Wilder, this arrangement? A. Why? Q. Yes. A. Well, it is a funny question to answer. It was one of these things that a proposition made to you in the ordinary course of business, and looks favorable to you on the first analysis of the matter, why sometimes you take them up, and sometimes you turn them down, and this one happened to look favorable to me on the first blush and I signed the contract and made the agreement."

Mr. Wilder's testimony concerning the transaction is not very different from that given by Mr. Nolte, except on one point. Mr. Wilder stated that Mr. Nolte told him, at the time he loaned him the plans, that he would like to bid on the Index job, but that he was financially unable to do so. Mr. Nolte denied that he made such a statement and insisted that he could have financed the job. He admitted, however, on cross-examination, that on the morning of the 14th, the day before the bids were to be opened, he had made no arrangements whatever for financing; that he took no bid check with him to Olympia; and that, at the time, substantially all of his assets were up as collateral for various sums owed to Bellingham banks. The evidence

shows that considerable financing was required. Wilder & Montfort furnished the two thousand dollar bid check, the performance bond, another bond for twenty-five thousand dollars required to protect the railway company, and during the progress of the work advanced cash up to eighteen thousand dollars.

While Nolte denied that he told Mr. Wilder that he could not make a bid, he did not affirmatively testify that he told him that he could. There is much reason to think that Wilder honestly believed that he could not, for he brought along with him a two thousand dollar bid check, although it is clear that he had never figured the job or intended to bid upon it, except in pursuance of some arrangement with Nolte. It may be noted, too, that, even on the morning of the 14th, Mr. Nolte did not tell Wilder that he intended to bid. At one point in his examination, Mr. Nolte said:

"Mr. Wilder at the time asked me if I was bidding on the job and I gave him a kind of noncommittal answer, and he says, 'Come on; I have a check for that job, and we will work something out in the matter,' and I says, 'Similar to this other job we had?' and he says, 'No; we will work something out on the way down.'"

At another point in his testimony concerning the same matter, Mr. Nolte testified:

"Why, on the morning of the 14th, Mr. Wilder called at my house quite early in the morning and said, 'Come on, let's go to Olympia.' And I kind of stalled for a few minutes, and he wanted to know if I intended to go down, and I said yes, probably later, I said."

It will be noted that Nolte himself testified that, when on the morning before the bidding was to close Wilder asked him if he intended to bid, he returned him a "noncommittal" and "half hearted" answer, and that, when Wilder said, "Come on, let's go to Olympia," he "stalled for a few minutes" and when Wilder asked

him point-blank whether he intended to go down, he said, "Yes, probably later." Whereupon Wilder told him that he had a bid check with him and Nolte, again, according to his own testimony, immediately inquired whether they could work out something "similar to the Rimrock job" and when Wilder said, "No, we will work something out on the way down," he accepted the suggestion with alacrity and at once set out with Wilder to Olympia. It would seem that Wilder had at least reasonable and probable cause to believe that Nolte did not intend to make an independent bid.

One who sets up the defense of illegality in an action of this kind has the burden of proof, first, because he who affirms always has the burden, and, second, because the defense, as is said in *McMullen v. Hoffman, supra,* "is a very dishonest one, . . ." and "is only allowed for public considerations and in order the better to secure the public against dishonest transactions."

The trial court was of the opinion that this case, upon its face, does not fall within the *McMullen v. Hoffman* case, but rather within the reasoning of the case of *Hegness v. Chilberg,* 224 Fed. 28, which, like this, is a single bid case. The facts, as the trial judge found them, justify this conclusion. It must be remembered that the trial court was in a much better position to determine which of the two witnesses was accurate in his recollection than we can possibly be. We think he properly analyzed the matter in his oral decision from which we quote as follows:

"I cannot see how, under the evidence, the plaintiff's entry into this transaction created a fraudulent situation insofar as the state of Washington was concerned, or would be apt to result in fraud upon the state or loss to the state, or could be said to be the type of combination of bidders which so many of the cited cases deal with and frown upon by declaring the transactions and

contracts illegal. . . . In the present case, Mr. Wilder and Mr. Nolte went to Olympia, and Mr. Wilder entered a bid, based upon Mr. Nolte's figures. That seems to be all that happened. He bid in his own name; that is true, but he followed that by employing Mr. Nolte as superintendent of the work, and he left him in charge of the conduct of the operations. In other words, he relied entirely upon Mr. Nolte's figures and conduct of the operations, and financed the job as he agreed to do. . . . The defense, as I say, is unconscionable. You have here two men who go ahead and do certain work, based upon certain promises and agreements. One man performs his agreement; the other man does not, and he comes into court and says the whole matter was illegal. Now, as our supreme court has said, the only reason that the defense is considered is that it is a matter of public policy that collusive bidding be discouraged, and this court, no matter how reluctant he might be in this case, would follow that rule if, as a matter of fact, the transaction was fraudulent and entered into for that reason, that is, to cause the state of Washington to pay more for the bridge than it otherwise would pay. But I do not believe under all of the evidence that that occurred, so I think the burden of proof upon the defendant of the defense of illegality must be said not to have been sustained."

The judgment appealed from is affirmed.

STEINERT, C. J., BEALS, MILLARD, and BLAKE, JJ., concur.