[No. 80811-2.    En Banc.]
Argued January 22, 2009.    Decided May 7, 2009.

JAMES TOMLINSON, *Petitioner*, v. PUGET SOUND FREIGHT LINES, INC., ET AL., *Respondents*.

*Stanley J. Rumbaugh* and *John E. Wallace* (of *Rumbaugh Rideout Barnett & Adkins*), for petitioner.

*Jerald P. Keene* and *Michael H. Weier* (of *Reinisch Mackenzie, PC*), for respondents.

*William A. Masters* and *John Klor* on behalf of Washington Self Insurers' Association, amicus curiae.

*Robert M. McKenna, Attorney General*, and *Rachel E. Feldstein, Assistant*, on behalf of Department of Labor and Industries, amicus curiae.

¶1 CHAMBERS, J. — James Tomlinson's knee was injured on the job. After a series of largely unsuccessful surgeries, the Washington State Department of Labor and Industries concluded that Tomlinson had a permanent total impairment of 75 percent of the left leg above the knee joint. It also found that at the time of the industrial accident, he had a preexisting permanent partial disability (PPD) of 50 percent of the left leg. Tomlinson's claim was granted, but only for 25 percent of the compensation set by statute for the debilitation of the entire limb. Tomlinson unsuccessfully appealed, arguing, among other things, that his alleged preexisting condition, degenerative arthritis, was not the

sort of condition that could be classified as a PPD. He contends that because arthritis is a progressive disease, there is no point before the end stage where it reaches maximum medical improvement and can be deemed fixed and stable and amenable to classification as a PPD.

¶2 We conclude that arthritis is both compensable as an industrial injury and may act as a PPD that reduces an award for an industrial injury. We affirm.

## FACTS

¶3 Tomlinson worked as a dispatcher for Puget Sound Freight Lines, Inc. (PSFL), a self-insured company. In 1999, when Tomlinson was 63 years old, he slipped down a flight of stairs at work and severely injured his left knee. After more conservative treatment failed, Tomlinson had three surgeries on his injured knee, including two total knee replacements. Unfortunately, the results were poor. After the third surgery, Tomlinson applied for benefits under the Industrial Insurance Act (IIA), Title 51 RCW. Tomlinson's treating orthopedic surgeon and two surgeons retained by the self-insured employer all agreed that after the accident, Tomlinson had a 75 percent PPD of that leg. PPDs are rated based on a statutory schedule, adjusted by percentage of impairment and preexisting conditions. The finder of fact found that all three doctors agreed that before the accident, Tomlinson had a 50 percent preexisting PPD, and the department accordingly granted Tomlinson a 25 percent PPD award.

¶4 Industrial injuries that result in a PPD are compensable under the IIA. RCW 51.32.080. However, any award is reduced by relevant preexisting PPDs. RCW 51.32.080(5). Tomlinson first developed left knee problems by the time he was in the Air Force in the 1960s. He also received a disability award for his knee from the Veterans Administration. He also had an industrial injury to his knee in 1991, and in about 1992, he had a conversation with Dr. Teeny regarding bilateral total knee replacements. Before

his 1999 industrial injury, it appears he had bone on bone contact in both the lateral and medial compartments of his left knee.

¶5 At his industrial insurance hearing, Tomlinson attempted to show that he had no impairment of function in his left knee before his July 21, 1999 industrial injury. The industrial appeals judge concluded otherwise. The judge found Tomlinson was evasive and somewhat antagonistic about his prior condition and lacked candor about his lack of symptoms. The judge was clear, stating on the record, "I cannot conceive that he was not symptomatic at the time of the industrial injury." Certified Appeal Board Record (CABR) at 9. Based upon the testimony of the three orthopedic surgeons, Tomlinson's testimony, and Tomlinson's medical history, the judge concluded that after the accident, Tomlinson had a 75 percent PPD, and at the time of the accident Tomlinson had a 50 percent preexisting PPD due to degenerative arthritis in that knee. The department granted the claim for benefits, reduced to 25 percent. The superior court and Division Two of the Court of Appeals affirmed. Clerk's Papers at 51; *Tomlinson v. Puget Sound Freight Lines, Inc.*, 140 Wn. App. 845, 166 P.3d 1276 (2007).

## ANALYSIS

¶6 We review legal questions de novo and challenged factual findings for substantial evidence. *E.g., Ingram v. Dep't of Licensing*, 162 Wn.2d 514, 522, 173 P.3d 259 (2007). PPD compensation is set by statute. RCW 51.32.080. Essentially, there is a fee schedule based on the "amputation value" of the limb or organ in question, reduced in proportion to the percentage of impairment and arithmetically by any preexisting PPDs:

> Should a worker receive an injury to a member or part of his or her body already, from whatever cause, permanently partially disabled, resulting in the amputation thereof or in an aggravation or increase in such permanent partial disability but not resulting in the permanent total disability of such worker, his

or her compensation for such partial disability shall be adjudged with regard to the previous disability of the injured member or part and the degree or extent of the aggravation or increase of disability thereof.

RCW 51.32.080(5). As the department has defined it in the administrative code:

> Permanent partial disability is any anatomic or functional abnormality or loss after maximum medical improvement (MMI) has been achieved. At MMI, the worker's condition is determined to be stable or nonprogressive at the time the evaluation is made. A permanent partial disability award is a monetary award designed to compensate the worker for the amputation or loss of function of a body part or organ system. Impairment is evaluated without reference to the nature of the injury or the treatment given. To ensure uniformity, consistency and fairness in rating permanent partial disability, it is essential that injured workers with comparable anatomic abnormalities and functional loss receive comparable disability awards. As such, the amount of the permanent partial disability award is not dependent upon or influenced by the economic impact of the occupational injury or disease on an individual worker. Rather, Washington's Industrial Insurance Act requires that permanent partial disability be established primarily by objective physical or clinical findings establishing a loss of function.

WAC 296-20-19000. Thus, procedurally, an industrial injury is not treated as a PPD until it has reached maximum medical improvement.

### 1. PROGRESSIVE DISEASES AND PPDs

¶7 Tomlinson argues that since arthritis is by nature progressive, as a matter of law, there is no point where it reaches maximum medical improvement and therefore no point (at least before the end stage) where the percentage of partial disability can be calculated. He cites *Hiatt*, where this court observed:

> The use of the word "permanent" together with "disability" indicates the character of the disability. It signifies that the

disability has expectedly an unchangeable existence; that the physical condition arising from the injury is fixed, lasting, and stable. A person whose condition is remediable is not permanently disabled.

*Hiatt v. Dep't of Labor & Indus.*, 48 Wn.2d 843, 846, 297 P.2d 244 (1956); *accord* WAC 296-20-19000 (referring to PPDs as "stable or nonprogressive"); *see also Miller v. Dep't of Labor & Indus.*, 200 Wash. 674, 680, 94 P.2d 764 (1939) ("before an allowance can be made for a [PPD], the condition . . . must have reached a fixed state"). The *Hiatt* court also cited with approval a dictionary definition that defined "permanent" in part as " 'not subject to fluctuation or alteration.' " *Hiatt*, 48 Wn.2d at 846 (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1954)); *accord Williams v. Virginia Mason Med. Ctr.*, 75 Wn. App. 582, 586, 880 P.2d 539 (1994). Since arthritis is by its nature progressive, he argues, there is no point where it becomes fixed, stable, or reaches maximum medical improvement.

¶8 However, PPD also has a refined meaning to properly deal with medical conditions that, by their nature may stabilize or improve but later deteriorate again. A condition may reach permanency when it becomes stable and *further treatment is unlikely to cure it*. WAC 296-20--01002; *cf. Allen v. Dep't of Labor & Indus.*, 48 Wn.2d 317, 318, 293 P.2d 391 (1956) (allowing benefits for arthritis); *Harper v. Dep't of Labor & Indus.*, 46 Wn.2d 404, 281 P.2d 859 (1955) (same); *In re Thompson*, No. 13,473, at 5-6 (Wash. Bd. of Indus. Ins. Appeals Sept. 11, 1962). A condition may be deemed permanent when it has reached maximum medical improvement, even if it may be expected to deteriorate further. WAC 296-20-01002; *accord Allen*, 48 Wn.2d at 318. Further, in cases like this, we have a date where even a degenerative preexisting PPD must be rated: the date of the compensable industrial injury.

¶9 The department, endorsed by regulation, often turns to the American Medical Association's materials to determine how to rate a particular disability. WAC 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. As Tomlinson notes, the 2001 American Medical Associa-

tion's *Guides to the Evaluation of Permanent Impairment* (Linda Cocchiarella & Gunnar B.J. Andersson eds., 5th ed. 2001) (2001 AMA GUIDES) uses language similar to that used in *Miller* and *Hiatt* to define "impairment."[1] But both the 2001 and 2008 AMA *Guides* also specifically have standards for rating disability based on arthritis. AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 511 (Robert D. Rondinelli et al. eds., 6th ed. 2008) (2008 AMA GUIDES) (classification for different knee impairments, including arthritis), 528 (specific example of arthritis in knee of elderly man); 2001 AMA GUIDES 544-45 (setting forth diagnostic and rating criteria). While this exact question has not been asked of Washington appellate courts before, Washington workers have been receiving PPD benefits for arthritis for many years. *See, e.g., Allen*, 48 Wn.2d at 318; *In re Thompson*, No. 13,473, at 5-6.

¶10 Perhaps more importantly, the corollary of saying that arthritis is not a preexisting PPD under the IIA is saying that arthritis is not a *compensable* PPD. As the attorney general suggests in an amicus brief, this flies in the face of the plain language of the IIA and its injunction that benefits be granted liberally to reduce the suffering and economic loss arising from industrial injuries. RCW 51.12.010. Washington State has been granting PPD ben-

---

[1] Relevantly, the current AMA *Guides* define "impairment" as "a significant deviation, loss, or loss of use of any body structure or body function in an individual with a health condition, disorder, or disease." AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 5 (Robert D. Rondinelli et al. eds., 6th ed. 2008) (2008 AMA GUIDES). This is in contrast to the 2001 definition of "impairment":

> **"a loss, loss of use, or derangement of any body part, organ system, or organ function."** . . . A medical impairment can develop from an illness or injury. An impairment is considered permanent when it has reached **maximal medical improvement (MMI)**, meaning it is well stabilized and unlikely to change substantially in the next year with or without medical treatment. The term *impairment* in the *Guides* refers to **permanent impairment**.

2001 AMA GUIDES at 2 (footnote omitted).

efits for arthritis for at least 50 years, and this seems to be the first time it has been challenged on the basis that it is a degenerative disorder.

¶11 Further, department regulations do *not* treat degenerative conditions as definitionally excluded from the universe of possible PPDs. Instead, the IIA regulations recognize that the rating may be done when the condition reaches "maximum medical improvement," WAC 296-20--19000, even if the condition can be expected to deteriorate:

> Maximum medical improvement occurs when no fundamental or marked change in an accepted condition can be expected, with or without treatment. Maximum medical improvement may be present though there may be fluctuations in levels of pain and function. *A worker's condition may have reached maximum medical improvement though it might be expected to improve or deteriorate with the passage of time.* Once a worker's condition has reached maximum medical improvement, treatment that results only in temporary or transient changes is not proper and necessary. "Maximum medical improvement" is equivalent to "fixed and stable."

WAC 296-20-01002(3) (emphasis added) (quoting from section "**Proper and necessary**"); *accord* 2001 AMA GUIDES at 601 ("A condition or state that is well stabilized and unlikely to change substantially in the next year, with or without medical treatment. Over time, there may be some change; however, further recovery or deterioration is not anticipated."). This applies to arthritis.

¶12 Our conclusion that arthritis can be a PPD before it reaches end state is consistent with long standing practice. In the 1939 *Miller* case, this court affirmed the department's decision that an injury was fixed even though an operation likely would have improved the worker's condition. *Miller*, 200 Wash. at 681 ("there is ample evidence to support the finding of the department that the appellant's condition had become fixed, because, without an operation, no improvement could be expected"). It also accords with the AMA *Guides*, which note that

> [*p*]*ermanency* is the condition whereby impairment becomes static or well stabilized with or without medical treatment and is not likely to remit in the future despite medical treatment, within medical probability. This term is usually synonymous with MMI, usually occurring when all reasonable medical treatment expected to improve the condition has been offered or provided.
>
> Impairment ratings are to be performed when an individual is at a state of permanency. However, many systemic or organ-based conditions are dynamic rather than static in nature and are, to some extent, never at permanency. In such cases, one can usually anticipate future functional decline based on the natural history of the disease process, which is generally well established in the literature.

2008 AMA GUIDES at 26-27. The AMA *Guides* also set forth guidance on impairment ratings for arthritis and similar conditions. *Id.* at 511, 518, 528. We hold that degenerative arthritis may be the basis of a compensable, and offsetable, PPD.

### 2. PREEXISTING CONDITIONS AND AMPUTATION

¶13 Tomlinson argues that as a matter of law, a joint that is totally removed cannot be deemed to have suffered from a preexisting PPD. This is a strained reading of the statute. RCW 51.32.080(5) speaks in terms of a body part that is "already, from whatever cause, permanently partially disabled" at the time of the industrial accident. Later treatment cannot retroactively change the condition of the body part at the relevant time. As Tomlinson had his total knee replacements after his industrial injury, we find it unnecessary to further examine this argument.

### 3. ARTHRITIS AND PPDS

¶14 Tomlinson contends that if arthritis can be a PPD, it qualifies only if it causes lack of functionality. We agree. The mere presence of degenerative arthritis that is "latent, or quiescent, and not disabling" is not enough to

warrant reducing an industrial insurance award when the industrial injury simply " 'lighted up,' or aggravated" the condition. *Donald W. Lyle, Inc. v. Dep't of Labor & Indus.*, 66 Wn.2d 745, 746, 748, 405 P.2d 251 (1965) (reduction appropriate for "a known, preexisting disabling injury or condition, and the preexisting arthritic condition of the plaintiff's employee . . . was not within this classification."). The Board of Industrial Insurance Appeals itself has held in a series of cases that a preexisting disability " 'is more than a mere preexisting medical condition and must, in some fashion, permanently impact on the worker's physical and/or mental functioning.' " *In re Norgren*, No. 04 18211, at 7 (Wash. Bd. of Indus. Ins. Appeals Jan. 12, 2006) (quoting *In re Pate*, No. 90 4055, at 4-6 (Wash. Bd. of Indus. Ins. Appeals May 7, 1992)).

¶15 Tomlinson is also correct that employers take their injured employees as they find them. Thus, employers are not entitled to seek a reduction in benefits when industrial injuries "light up" previous injuries or when workers have a condition that does not qualify as PPD but makes them more vulnerable to injuries. *Bennett v. Dep't of Labor & Indus.*, 95 Wn.2d 531, 533, 627 P.2d 104 (1981) (citing *Miller*, 200 Wash. at 683). In *Bennett*, for example, the employee sought benefits for a 1973 back injury. *Id.* at 534. There was evidence that the employee's back had been weakened by previous accidents. *Id.* There was medical testimony that these previous injuries made the employee more vulnerable and prone to injury but that prior to the time of the 1973 injury, his functionality was unimpaired. *Id.* This court affirmed a jury verdict that the employee had 20 percent PPD due entirely to the 1973 accident, with no reduction for the weakened back, noting that that was appropriate when " 'the workman's prior physical condition is not deemed the cause of the injury, but merely a condition upon which the real cause operated.' " *Id.* at 533 (quoting *Miller*, 200 Wash. at 683). If the accident had merely lit up a latent injury, then Tomlinson would not be subject to a reduction for a PPD.

¶16 We also agree with Tomlinson that the Court of Appeals may have misread *Beyer v. Department of Labor & Industries*, 17 Wn.2d 29, 134 P.2d 948, 137 P.2d 1016 (1943). Beyer was blind in his right eye before he suffered an industrial injury to the same eye requiring enucleation (removal). The statutory schedule provided for an award of $1,080 for " '[l]oss of sight of one eye' " and $1,440 for " '[l]oss of one eye by enucleation.' " *Id.* at 30 (quoting REM. REV. STAT. § 7679). The court below may have concluded *Beyer* was analogous to Tomlinson's case. We find it is not. *Beyer* does not stand for the principle that a person who loses an eye in an industrial injury may have his award reduced if he had poor vision before the injury. In *Beyer*, the statutory schedule listed an award for the loss of sight of one eye and then a greater award for the removal of an eye. *Beyer* would be analogous if Tomlinson had an amputation at the ankle and later an amputation above the knee. *Beyer* does not justify reducing an award for the loss of an eye just because the worker already had the impaired sight of the affected eye.

¶17 We have also previously rejected the argument that a worker's claim could be denied because the worker suffered from preexisting degenerative arthritic disease. In *Dennis v. Department of Labor & Industries*, 109 Wn.2d 467, 745 P.2d 1295 (1987), Dennis had preexisting osteo-arthritis; his work involved the use of tin snips as a sheet metal worker.[2] The work aggravated his osteoarthritis, which became symptomatic and disabling. We reviewed the principles applicable to the IIA and its purpose of providing compensation to all covered employees injured in their employment:

> "It is a fundamental principle which most, if not all, courts accept, that, if the accident or injury complained of is the proximate cause of the disability for which compensation is sought, the previous physical condition of the workman is

---

[2] *Dennis* involved industrial disease instead of injury, but the principles are applicable to industrial injury.

immaterial and recovery may be had for the full disability independent of any preexisting or congenital weakness; the theory upon which that principle is founded is that the workman's prior physical condition is not deemed the cause of the injury, but merely a condition upon which the real cause operated."

The worker is to be taken as he or she is, with all his or her preexisting frailties and bodily infirmities.

*Dennis*, 109 Wn.2d at 471 (quoting *Miller*, 200 Wash. at 682-83 and citing *Wendt v. Dep't of Labor & Indus.*, 18 Wn. App. 674, 682-83, 571 P.2d 229 (1977)).

¶18 If a worker is to be taken with all of his or her preexisting frailties and bodily infirmities, it is axiomatic that older, more mature workers will often have bodies experiencing degenerative processes and feeling the effects of wear and tear over the years. It is, of course, the skill and knowledge gained by years of experience that make mature workers so valuable to their employers. A worker's PPD cannot be reduced merely because x-rays suggest preexisting degenerative arthritic changes at the time of the injury without additional evidence that the degeneration resulted in loss of functionality sufficient to make that degeneration a preexisting PPD. In sum, if an accident or injury is the proximate cause of the disability for which compensation is sought, the previous physical condition of the worker is immaterial and recovery may be had for the full disability independent of any preexisting or congenital weakness because the worker's prior physical condition is not deemed the cause of the injury but merely a condition upon which the real cause operated. *Bennett*, 95 Wn.2d at 532-33 (citing *Miller*, 200 Wash. at 683).

¶19 RCW 51.32.080(5) provides for a reduction in benefits if the preexisting condition has already developed into a PPD within the meaning of the IIA. But a preexisting PPD is more than a mere preexisting medical condition. *In re Norgren*, No. 04 18211, at 7 (quoting *In re Pate*, No. 90 4055, at 4-6). It must, in some substantial fashion, permanently impact the worker's physical or mental functioning.

The preexisting PPD's impact on function must be substantial and permanent. A preexisting condition that causes intermittent impairment of function is not a PPD for purposes of reduction of benefits. *Id.*

### 4. SUFFICIENCY OF THE EVIDENCE

¶20 Tomlinson does not formally challenge the industrial appeals judge's factual finding that he had an arthritic 50 percent preexisting PPD. However, woven throughout his appeal is an attack on that finding. *E.g.*, App. Br. at 8-15. PSFL argues this issue is not preserved, but since it is raised throughout the case, we will address it briefly.

¶21 First, we note that Tomlinson asserts that our review is de novo because, he contends, his argument is primarily about the interpretation of a statute. To the extent that we are reviewing the law, he is correct. However, to the extent that he is challenging the judge's factual finding, he is not. The industrial appeals judge made a factual finding, on the record, that Tomlinson had a 50 percent preexisting PPD of the left leg below the knee. To the extent that factual finding is challenged, we review for substantial evidence. *E.g.*, *Ingram*, 162 Wn.2d at 522.

¶22 Tomlinson's principal argument is that x-ray findings, while objective in that they can be seen, are not, solely by themselves, proof of a loss of physical function. *Cf. In re Johnston*, No. 97 4529, 1999 WL 190864 (Wash. Bd. of Indus. Ins. Appeals Mar. 2, 1999). We emphatically agree that x-ray findings alone would be insufficient, but that is not the case before us. The industrial insurance judge concluded that all three physicians who testified, including his treating doctor, agreed that at the time of the industrial injury, Tomlinson's preexisting condition was bone on bone in his weight bearing knee joint. He also found that all three physicians agreed that he had a preexisting 50 percent PPD. In addition, the industrial appeals judge heard Tomlinson's own testimony, which the judge found evasive. He showed "lack of candor" about his past medical

treatment and did not remember injuring his knee and discussing the possible need for a bilateral total knee replacement seven years before his industrial injury. CABR at 9. In short, Tomlinson's own testimony supported the conclusion that he had loss of function before his 1999 industrial injury. We find there was substantial evidence to support the finding of a preexisting PPD.

## CONCLUSION

¶23 Arthritis can be both a compensable PPD and a benefit-reducing, preexisting PPD. Ordinarily, the previous physical condition of the worker is immaterial and recovery may be had for the full disability independent of any preexisting or congenital weakness because the worker's prior physical condition is not deemed the cause of the injury but merely a condition upon which the real cause operated. A worker's PPD cannot be reduced merely because x-rays reveal preexisting degenerative arthritic changes. In order to be an offsetting preexisting PPD, the preexisting PPD's impact on function must be substantial and permanent. We hold there was substantial evidence to support the findings and conclusions of the courts below, and they are affirmed.

ALEXANDER, C.J.; C. JOHNSON, MADSEN, SANDERS, OWENS, J.M. JOHNSON, and STEPHENS, JJ.; and KULIK, J. PRO TEM., concur.