# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CATHRINE ELLIOTT, | No. 57887-5-II |
| Appellant, | |
| v. | |
| CAHILL & HIRATA RESOURCES, | UNPUBLISHED OPINION |
| Respondent. | |

MAXA, J. – Cathrine Elliott appeals the trial court's order granting the Department of Labor & Industries' (DLI) motion in limine, which precluded her from presenting to the jury whether she qualified for permanent partial disability (PPD).

Elliott had preexisting chronic obstructive pulmonary disorder (COPD), which was aggravated by an occupational exposure to air contaminants. DLI accepted her claim for temporary exacerbation of her pre-existing COPD in June 2017, but later closed the claim in July 2019 without an award of PPD. The Board of Industrial Insurance Appeals (BIIA) affirmed DLI's order. On appeal to superior court, the trial court ruled in an in limine order that Elliott could not make a PPD claim to the jury because there was insufficient evidence to support the claim. The jury subsequently affirmed the BIIA's decision.

We hold that Elliott presented sufficient evidence to assert a PPD claim to the jury. Accordingly, we reverse and remand for a new trial where Elliott may present a PPD claim.

FACTS

*Background*

Elliott had preexisting COPD. She was exposed to air contaminants working as a commercial truck driver for Cahill & Hirata Resources, which aggravated her COPD. Elliott applied for workers' compensation benefits in June 2017, and DLI accepted her claim for temporary exacerbation of her preexisting COPD.

*Medical Treatment*

Elliot was treated by Dr. Paul Darby, an occupational medicine physician. Dr. Darby first saw Elliott in June 2017. She previously had been hospitalized from March 1 to March 7, 2017. On the first day of her hospitalization, her ammonia level was 83 micromoles per liter, which was above the reference range of 18 to 72. Dr. Darby found that Elliott had wheezing in both lungs and had swollen legs. He determined that she had preexisting COPD, which was related to tobacco abuse, but might also be occupationally related to her exposure to ammonia, coolant, and diesel exhaust fumes.

In July 2017, Dr. Darby conducted spirometry testing – a type of pulmonary function test – and found an absolute ratio of 61 percent. A week later he conducted testing again and found an absolute ratio of 52 percent. In September 2017, the absolute ratio was 57 percent, which Dr. Darby noted "remained severe." Clerk's Papers (CP) at 291.

Dr. Darby continued to treat Elliott over the next year, and he last saw her in September 2018. At that time her condition had not improved.

Elliott also was seen by Dr. Peter Rabinowitz, a physician with training in occupational and environmental medicine. At this first visit in November 2017, Dr. Rabinowitz saw evidence of wheezing and noted that Elliott had swollen legs. He noted that she could perform light duties

at work, but that she should avoid irritating fumes and dust that would exacerbate her lung condition.

Dr. Rabinowitz stated that Elliott had a long history of breathing problems that apparently stemmed from respiratory infections she had as a child, as well as from about 40 years of smoking. From his first visit with Elliott, Dr. Rabinowitz knew that she had serious lung disease and experienced difficulties, like shortness of breath, that were impacting her ability to work. He also noted that Elliott had been hospitalized for COPD, which was a common side effect of smoking. COPD is not reversible with treatment. Acute exacerbations can be treated to help people return to their baseline, but treatment cannot completely cure the condition.

Elliott had a CT scan done in December 2017, and Dr. Rabinowitz noted that it showed airway thickening, pleural thickening, and some scarring. He stated that the pleural thickening and scarring were not very typical with COPD.

Dr. Rabinowitz also reviewed some of DLI's testing results of ammonia levels from Elliott's truck. The results showed that the ammonia was below the detection limit. But Dr. Rabinowitz suggested that DLI complete more testing because the results may not have been reproducing actual road exposures.

At her January 2018 visit, Elliott had more shortness of breath than Dr. Rabinowitz had seen before, and he felt she needed to be removed from work temporarily while evaluating her pulmonary status.

Dr. Rabinowitz saw Elliott again in February. Pulmonary function tests showed that when she walked 400 feet her oxygen level would go down, which was concerning. He stated that it was more likely than not that occupational exposure contributed to Elliott's current respiratory status.

Dr. Rabinowitz continued to see Elliott in through June of 2018. In June, Dr. Rabinowitz assessed that it was more likely than not that Elliott's occupational exposure to air contaminants caused acute exacerbations of her COPD and contributed to her respiratory impairment. And he believed that her significant respiratory impairment limited her ability to perform anything more than sedentary work.

In July 2018, Dr. Rabinowitz corresponded with a nurse at DLI. He wrote that Elliott had suffered acute COPD exacerbations from work, but the work exposure to contaminants did not cause the underlying COPD to worsen. Dr. Rabinowitz also opined that the acute exacerbations had resolved, and Elliott now was at her nonoccupational COPD baseline. He believed that Elliott needed further treatment, but not due to work exposures.

In June 2019, almost a year later, Elliott was seen by Dr. Dan Gerstenblitt, a physician board certified in internal and occupational medicine, for an independent medical examination. When Dr. Gerstenblitt saw Elliot, she was carrying an oxygen tank. He stated that she was much worse than her condition several years earlier, based on his reading of her medical history.

Elliott's medical history showed that she had been hospitalized for a pulmonary embolism, which Dr. Gerstenblitt mentioned was a very significant issue for potential deterioration in lung function. Dr. Gerstenblitt noted that in March 2017, Elliott's FEV1 – a type of breathing test – was only 49 percent, "which [was] terrible." CP at 353. In September 2017, her FEV1 was still about 40 percent, and in January 2018, her FEV1 was 37 percent, with improvement to 51 percent after a bronchodilator.

Elliott's primary complaint when she saw Dr. Gerstenblitt was that she was having difficulty breathing. When he listened to her with a stethoscope, she had wheezing present, but she had good breath sounds. Dr. Gerstenblitt also stated that Elliott had varicose veins on her

legs, her lower extremities were swollen, her toes appeared blue, and he had difficulty feeling the pulses in her legs.

Dr. Gerstenblitt stated that it was his impression that Elliott had a temporary exacerbation of her underlying COPD, and not a permanent aggravation, because there was no environment hygiene data showing that she was exposed to any specific chemical in the truck. He noted that although Dr. Darby emphasized that Elliott was exposed to ammonia, ammonia is an additive in cigarettes and smoking cigarettes could lead to an elevated ammonia level. Dr. Gerstenblitt also stated that had there been an exposure to ammonia, a brief exposure would not permanently impact the underlying COPD, and that COPD typically does not improve over time. He believed that the natural progression of Elliott's COPD was what caused the exacerbations.

In July 2019, DLI closed Elliott's claim without a PPD award because her medical records showed that treatment was no longer necessary. Elliott protested the claim closure order and DLI reconsidered, but DLI affirmed the order in October 2019.

*Appeal to BIIA*

Elliott appealed DLI's decision to the BIIA. The BIIA heard testimony from the three doctors and Elliott. The doctors testified to their examination and treatment of Elliott as discussed above. In addition, Dr. Darby testified that Elliott's COPD was preexisting, but it was permanently aggravated by occupational exposure on a more probable than not basis. Dr. Darby stated that he believed Elliott was not at her preinjury baseline and would never be at her preinjury baseline. When asked if Elliott would need treatment for the permanent exacerbation of COPD as of July 30, 2019, he responded, "Yes." CP at 278. Dr. Darby believed that even assuming that Elliott did not need further treatment as of July 30, 2019, she would have a permanent impairment as of that date. And his opinion did not change as of October 2019.

Dr. Gerstenblitt stated that as of the date of his exam in June 2019, he did not think that Elliott was permanently unable to work due to her exposure in 2017. He also stated that as of June 2019, she did not need treatment due to her exposure in 2017, but that she needed treatment for her preexisting COPD and its natural progression. On cross-examination, Elliott asked Dr. Gerstenblitt if she was at maximum medical improvement (MMI). He responded that Elliott would need oxygen for "the natural progression of her underlying condition," but that she was "considered fixed and stable." CP at 362.

The BIIA affirmed DLI's order closing Elliott's claim. The BIIA found that in October 2019, Elliott did not have a PPD proximately caused or aggravated by the occupational disease and that her condition that was "proximately caused or aggravated by the occupational disease was fixed and stable and did not need further proper and necessary treatment." CP at 11-12.

*Appeal to Superior Court*

Elliott appealed the BIIA's final order to the superior court. At the superior court, DLI filed a motion in limine to preclude Elliott from asserting that she was entitled to seek a PPD award because she did not present any testimony or evidence that rated her impairment. The trial court granted DLI's motion, stating that Elliott "needed to present more if she was going to be looking for . . . an actual rating . . . before the Board." Rep. of Proc. (RP) at 47-48. After listening to a transcript of the BIIA hearing, the jury returned a verdict affirming the BIIA's order.

Elliott appeals the trial court's order granting DLI's motion in limine.

ANALYSIS

A.    STANDARD OF REVIEW

The Industrial Insurance Act (IIA), chapter 51.04 RCW, governs judicial review of workers' compensation decisions. *Smith v. Dep't of Labor & Indus.*, 22 Wn. App. 2d 500, 506, 512 P.3d 566, *review denied*, 200 Wn.2d 1013 (2022).

DLI supervises the medical treatment for workers that are injured in the course of their employment. *Shafer v. Dep't of Labor & Indus.*, 166 Wn.2d 710, 716, 213 P.3d 591 (2009). A worker may appeal DLI's orders, decisions, and awards to the BIIA. RCW 51.52.050(1)-(2)(a). A worker that is aggrieved by the BIIA's decision and order may appeal to the superior court. RCW 51.52.110. The overriding principle in workers' compensation cases is that the IIA is liberally construed for the benefit of the worker. RCW 51.12.010.

Under the IIA, we review the trial court's decision and not the BIIA's order. *Smith*, 22 Wn. App. 2d at 506. Substantial evidence exists if the record has a sufficient quantity of evidence to persuade a rational person of the truth of the stated premise. *Robbins v. Dep't of Labor & Indus.*, 187 Wn. App. 238, 247, 349 P.3d 59 (2015).

B.    STATUTORY OVERVIEW

1.    Permanent Partial Disability

When a worker is injured and entitled to compensation under the IIA, they will receive "proper and necessary" medical, surgical, and hospital services during the period of their disability resulting from the injury. RCW 51.36.010(2)(a). Any worker who is injured is entitled to compensation for the full disability, independent of any preexisting condition. *Boeing Co. v. Doss*, 183 Wn.2d 54, 57, 347 P.3d 1083 (2015). And DLI is required to pay for the provided treatment. RCW 51.36.080(1).

A worker is entitled to receive a PPD award if they have "any anatomic or functional abnormality or loss after MMI has been achieved." WAC 296-20-19000. In other words, PPD is defined as a disability remaining after MMI is achieved. WAC 296–20–19000. If a PPD exists, a worker receives a monetary award to compensate them "for the amputation or loss of function of a body part or organ system," rather than for a worker's lost wages or lost earning power. WAC 296-20-19000; *Boeing Co.*, 183 Wn.2d at 60. Payment for the treatment ceases when compensation for the injury is awarded. RCW 51.36.010(4).

A PPD award can be made only if the worker has reached MMI. WAC 296–20–19000. "At MMI, the worker's condition is determined to be stable or nonprogressive at the time the evaluation is made." WAC 296-20-19000. WAC 296-20-01002 ("proper and necessary" subsection (3)) states,

> The department or self-insurer stops payment for health care services once a worker reaches a state of maximum medical improvement. Maximum medical improvement occurs when no fundamental or marked change in an accepted condition can be expected, with or without treatment. Maximum medical improvement may be present though there may be fluctuations in levels of pain and function. . . . "Maximum medical improvement" is equivalent to "fixed and stable."

Therefore, "procedurally, an industrial injury is not treated as a PPD until it has reached maximum medical improvement." *Tomlinson v. Puget Sound Freight Lines, Inc.*, 166 Wn.2d 105, 110, 206 P.3d 657 (2009).

Once DLI determines a worker's condition to be stable, it then issues a closing order " 'based on factors which include medical recommendation, advice, or examination.' " *Shafer*, 166 Wn.2d at 717 (quoting RCW 51.32.160(1)(b)). PPD primarily is established by "objective physical or clinical findings establishing a loss of function." WAC 296-20-19000.

2.    Respiratory Disorders

Respiratory disorders are considered to be "[u]nspecified disabilities." WAC 296-20-19010(2). However, WAC 296-20-380 describes six categories of permanent respiratory disorders based on different levels of FVC and FEV1 testing and FEV1/FVC ratios as well as maximum oxygen consumption results after exercise testing.

C.    SUFFICIENCY OF EVIDENCE FOR PPD

Elliott argues that the trial court erred when it granted DLI's motion in limine to preclude her from presenting the question of PPD to the jury. DLI argues that Elliott did not present sufficient evidence to take the issue to the jury. We agree with Elliott.

1.    Legal Principles

Various cases provide guidelines for evaluating sufficiency of the evidence for PPD claims. First, a claimant must provide expert medical testimony based on objective symptoms that existed on or prior to the closing date, or within a reasonable time afterward. *Hyde v. Dep't of Labor & Indus.*, 46 Wn.2d 31, 34, 278 P.2d 390 (1955). And the evidence must address the worker's condition as of the date of the closing order. *Harper v. Dep't of Labor & Indus.*, 46 Wn.2d 404, 407, 281 P.2d 859 (1955).

Second, for an unspecified disability (such as the respiratory disorder here), a medical expert is not required to testify using the precise statutory language. *Anthis v. Dep't of Labor & Indus.*, 16 Wn. App. 335, 339, 555 P.2d 1009 (1976). " 'Expert testimony on the extent of an unspecified disability need not be in the language of the statute; it may be probative even though it is not couched in terms of comparison to a scheduled injury.' " *Id.* (quoting *Dowell v. Dep't of Labor & Indus.*, 51 Wn.2d 428, 434, 319 P.2d 843 (1957)).

9

Third, medical witnesses are not required to express their opinions on disability in terms of a percentage. *Dowell*, 51 Wn.2d at 433.

2. Analysis

Elliott argues that she presented sufficient evidence to support a PPD disability claim. We agree.

Elliott relies on the testimony of Dr. Darby. Dr. Darby last examined Elliott in September 2018, but he also reviewed Dr. Gerstenblitt's report from July 2019 showing that Elliott still was on oxygen. Dr. Darby's opinion was that Elliott had preexisting COPD, but that it was permanently aggravated by occupational exposure on a more probable than not basis. Specifically, Dr. Darby gave an opinion that Elliott had a permanent impairment as of July 30, 2019. He stated that he did not believe Elliott was at her preinjury baseline and would never be at her preinjury baseline. Dr. Darby also believed that Elliott would need treatment for the permanent exacerbation of COPD as of July 2019. He based this opinion on Elliott's wheezing in both lungs, swollen legs, and "severe" spirometry testing results. CP at 267, 289-91. And even if Elliott did not need any future treatment, Dr. Darby stated that she would have a permanent impairment as of July 30, 2019, the time of closure.

We conclude that this testimony is sufficient for Elliott to support a PPD claim. Dr. Darby did not believe that Elliott had reached MMI. But even if she had reached MMI in July 2019, Dr. Darby opined that Elliott would have a permanent impairment as of that date. If she had a permanent impairment, Elliott was eligible for PPD because PPD is defined as a disability remaining after MMI is achieved. WAC 296–20–19000.

DLI makes several arguments that Elliott did not present sufficient evidence to support a PPD claim. First, DLI emphasizes that the evidence on which Elliott relies was from 2017 and

2018, long before claim closure. DLI asserts that medical testimony on PPD must be tied to the closure date.

However, the cases do not require the medical testimony to be based on findings from the closing date. The testimony must be based upon objective symptoms that existed *on or prior to* the closing date. *Hyde*, 46 Wn.2d at 34. And the testimony regarding disability must be *tied to* the closing date. *Harper*, 46 Wn.2d at 407. Here, although Dr. Darby last examined Elliott in September 2018, he tied his testimony to the relevant closing date. His opinion was that Elliott had a permanent impairment as of July 30, 2019, the time of closure.

Because the pulmonary test results were from 2017 and 2018, they may not be as relevant to Elliott's condition at the time of closure. But whether these tests support a PPD goes to the weight of that evidence, not its sufficiency.

Second, DLI asserts that Elliott failed to present evidence involving measurements of FVC, FEV1, and the FEV1/FVC ratio. As noted above, WAC 296-20-380 outlines several categories of permanent respiratory impairments, which are based on FVC, FEV1, and FEV1/FVC ratio measurements. But under WAC 296-20-19010(2), respiratory disorders are unspecified disabilities. And COPD is a respiratory disorder. Therefore, Dr. Darby was not required to express his opinions on disability using the language of the regulation. *See Anthis*, 16 Wn. App. at 339.

Third, DLI asserts that Elliott was required to segregate her preexisting COPD condition and the alleged PPD related to the occupational exposure. DLI relies on *Orr v. Dep't of Labor &*

*Indus.*, 10 Wn. App. 697, 519 P.2d 1334 (1974) and *Tomlinson*, 166 Wn.2d 105. Both cases

focus on RCW 51.32.080(5),[1] which states,

> Should a worker receive an injury to a member or part of his or her body *already, from whatever cause, permanently partially disabled,* resulting in the amputation thereof or in an aggravation or increase in such permanent partial disability but not resulting in the permanent total disability of such worker, his or her compensation for such partial disability shall be adjudged with regard to the previous disability of the injured member or part and the degree or extent of the aggravation or increase of disability thereof.

(Emphasis added.)

In *Orr*, the worker injured his back in 1968. 10 Wn. App. at 698. The facts revealed that

Orr had suffered multiple prior back injuries in 1955. *Id.* The worker acknowledged that before

the 1968 injury he had continuing low back symptoms that in some ways incapacitated him. *Id.*

at 701-02. Orr's medical witness believed that he qualified for PPD, but his opinion was based

on the worker's overall back disability from whatever cause. *Id.* at 701. The court held that

there was not sufficient evidence to permit a jury to establish an amount of PPD attributable to

the 1968 injury because the worker's medical witness failed to segregate the preexisting

disability from the current disabling condition. *Id.* at 702, 704-05.

In *Tomlinson*, DLI concluded that after a work injury, the worker had a 75 percent PPD

of his left leg. 166 Wn.2d at 108. It also found that at the time of his occupational accident, the

worker had a preexisting PPD of 50 percent of his left leg. *Id.* DLI accordingly awarded him a

25 percent PPD. *Id.* Tomlinson appealed, challenging the factual finding that he had 50 percent

preexisting PPD. *Id.* at 118. The Supreme Court held that a prior condition that amounts to a

preexisting PPD can reduce the PPD for the current condition. *Id.* at 117-18.

---

[1] Both cases rely on earlier versions of the statute, but the language is nearly identical so we cite to the current version.

Both *Orr* and *Tomlinson* stated that segregation was required under the facts of those

cases. However, the court in *Orr* acknowledged that the segregation requirement applies

> "only to cases in which the workman already is, *in fact*, permanently partially
> disabled within the meaning of the workmen's compensation act, but that it does
> not apply when the preexisting weakened or congenital condition, independent of
> the subsequent injury, has not, in any way, incapacitated the workman or has not,
> of itself, constituted a disability."

10 Wn. App. at 700 (quoting *Miller v. Dep't of Labor & Indus.*, 200 Wash. 674, 94 P.2d

764 (1939)).

Here, none of the doctors testified that Elliott in fact had a preexisting PPD before her

industrial injury. Therefore, segregation was not required.

The doctors all agreed that Elliott had preexisting COPD that was exacerbated by her

occupational exposure. They disagreed on how much her current suffering was from her

preexisting COPD and how much was from the occupational exposure. But when experts

disagree as to the amount of disability due to the work injury, the jury may arrive at a verdict

between the opinions. *Orr*, 10 Wn. App. at 704.

We conclude that Elliott presented sufficient evidence to support a PPD claim.

Therefore, we hold that the trial court erred when it granted DLI's motion in limine to preclude

Elliott from presenting a PPD claim to the jury.

D.    ATTORNEY FEES

Elliott requests attorney fees under RCW 51.52.130. That statute requires an award of

attorney fees where a "decision and order is reversed or modified and additional relief is

granted." RCW 51.52.130(1).

When an appellate court remands a case for retrial, it cannot properly award fees because

the prevailing party has not yet been determined. *Felipe v. Dep't of Labor & Indus.*, 195 Wn.

13

App. 908, 920, 381 P.3d 205 (2016).  Therefore, awarding attorney fees at this time is premature, but the trial court may award appellate attorney fees after retrial, if appropriate.  *Id.*

CONCLUSION

We reverse and remand for a new trial where Elliott may present a PPD claim.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____

MAXA, J.

We concur:

_____

CRUSER, C.J.

_____

VELJACIC, A.C.